## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| A.W., by and through his parents, H.W. and A.W., | : | CIVIL ACTION NO. 1:13-CV-2379 |
| | : | |
| | : | **(Chief Judge Conner)** |
| **Plaintiffs** | : | |
| | : | |
| v. | : | |
| | : | |
| **MIDDLETOWN AREA SCHOOL DISTRICT,** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM

Minor plaintiff A.W., by and through his parents H.W. and A.W. ("Parents"), filed the above-captioned action, alleging that defendant Middletown Area School District ("District") violated the Individuals with Disabilities Education Act ("IDEA"), as amended, 20 U.S.C. § 1400 *et seq.*; Section 504 of the Rehabilitation Act of 1973 ("Section 504"), as amended, 29 U.S.C. § 794; the Americans with Disabilities Act ("ADA"), as amended, 42 U.S.C. § 12101 *et seq.*; and Chapters 14 and 15 of the Pennsylvania Code. Plaintiffs appeal the decision of Pennsylvania Special Education Hearing Officer William F. Culleton, Jr. ("Hearing Officer") that, notwithstanding an unnecessarily delayed evaluation process, the District provided A.W. a free appropriate public education during the period in dispute and that compensatory education was unwarranted. Plaintiffs seek, *inter alia*, a reversal of the Hearing Officer's decision with respect to the 2011-2012 school year and portion of the 2012-2013 school year, full days of compensatory education, and reasonable attorneys' fees and costs. Presently before the court are cross-motions (Docs. 19, 21)

for judgment on the supplemented administrative record.  After thoroughly
reviewing the record, and for the reasons that follow, the court will deny the
District's motion, grant in part and deny in part plaintiffs' motion, and remand this
matter to the Hearing Officer to determine the compensatory education award to
which plaintiffs are entitled.

## I.   <u>Background</u>

### A.   **Factual Background**[1]

A.W. is a seventeen-year-old student with emotional support needs who
attended District schools for much of his primary and secondary education.
Plaintiffs contend that the District denied A.W. a free appropriate public education
("FAPE") during the 2011-2012 school year and through February 26, 2013 of the
2012-2013 school year.  The court finds it useful to explicate A.W.'s medical and
educational history prior to and during the time period at issue.

#### 1.   *Kindergarten through Seventh Grade*

Between kindergarten and second grade, A.W. was frequently absent from
school.  Parents received numerous letters from the District regarding his absences.
(P-1; P-2; P-3).  During third grade, the District advised A.W.'s mother to have A.W.
evaluated.  (N.T. 41:19-25).  In February 2007, Dr. Angela A. Gorman ("Dr.
Gorman") of Penn State Milton S. Hershey Medical Center diagnosed A.W. with

---

[1] Citations to the record include the Hearing Officer's June 15, 2013 decision
(Doc. 22-1, Ex. A ("H.O.D.")); the notes of testimony from April 17, 2013, May 2, 2013,
and May 13, 2013 (Docs. 15-1 to 15-3 ("N.T. __")); Parents' exhibits (Docs. 15-4 to
15-6 ("P-")); and the District's exhibits (Docs. 15-7 to 15-9 ("S-")).

social phobia, separation anxiety disorder, and generalized anxiety disorder.  (P-5 at 2-4).  A.W. has received therapy for his anxieties since third grade.  (N.T. 42:10-11).

In January 2008, A.W. was admitted to a psychiatric ward at Hershey Medical Center.  (Id. at 54:11-16).  A.W. sought treatment for his anxiety.  (Id. at 54:17-57:16).  A.W.'s mother informed the District of this development via email.  (P-7 at 1).  A.W. was homeschooled from April 2008 to June 2008 before returning to a District elementary school.  (P-12 at 2).

In a May 2008 letter to the principal of the elementary school, Dr. Gorman reiterated A.W.'s diagnoses and stated that the District must assist in alleviating A.W.'s separation anxiety by, *inter alia*, rewarding A.W. for attendance, providing intermittent "coping breaks," and minimizing A.W.'s stress in school.  (P-5 at 4-5).  Dr. Gorman emphasized that "[c]onsistency in following through with interventions, and collaborating with [A.W.] and his family in all school interventions is crucial to his treatment success."  (Id. at 5).

In April 2008, the District issued a permission to evaluate ("PTE") for the purposes of identifying whether A.W. was eligible for special education and related services.  (P-8 at 1).  A.W.'s mother consented to the PTE.  (P-8 at 2).  In August 2008, the District implemented a service agreement pursuant to Section 504 and Chapter 15 of the Pennsylvania Code, which included certain accommodations that Dr. Gorman recommended.  (P-9; N.T. 71:5-12).  A.W.'s mother approved the service agreement.  (P-9).

The District issued its evaluation report in September 2008.  The report noted A.W.'s positive academic performance and concluded that he should not be

classified as a child with an emotional disturbance under the IDEA and hence was not eligible for special education services.  (P-12 at 9-10).[2]  The report also found that A.W. did not require any specially designed instruction other than the supports offered in his service agreement.  (Id.)  The report acknowledged the importance of reassessing A.W.'s accommodations if he demonstrated a need for additional supports.  (Id. at 10).  A.W.'s mother agreed with this evaluation.  (Id. at 11, 13-14).

The District's lengthy attendance records for A.W. between 2003 and 2008 indicate, *inter alia*, illnesses, medical appointments, family matters, late arrivals, and anxiety issues.  (P-10).  In November 2008, A.W. withdrew from the District and enrolled in the Pennsylvania Cyber Charter School ("PA Cyber").  (P-13).  A.W. remained a student at PA Cyber through the end of the 2009-2010 school year.  (N.T. 189:9-13).  PA Cyber implemented a service agreement that provided A.W. certain accommodations for the Pennsylvania System of School Assessment.  (Doc. 14-1, Ex. A).

---

[2] The IDEA defines an "emotional disturbance" as a marked condition that continues over a long period of time, that adversely affects a student's educational performance, and that includes one or more of the following:

(A) An inability to learn that cannot be explained by intellectual, sensory, or health factors.

(B) An inability to build or maintain satisfactory interpersonal relationships with peers and teachers.

(C) Inappropriate types of behavior or feelings under normal circumstances.

(D) A general pervasive mood of unhappiness or depression.

(E) A tendency to develop physical symptoms or fears associated with personal or school problems.

34 C.F.R. § 300.8(c)(4)(i).

A.W. returned to the District as a seventh-grade student for the 2010-2011 school year.  A.W. desired increased socialization and felt ready to return to a physical classroom.  (N.T. 78:25-79:11).  Prior to his reenrollment, A.W.'s mother requested that Kevin Cook ("Cook)," principal of Middletown Area Middle School, review A.W.'s attendance records.  (Id. at 81:2-8, 295:3-18).  In the fall of 2010, A.W.'s mother informed Cook about A.W.'s anxiety.  (Id. at 89:14-90:12, 294:24-295:2).

A.W. had difficulties in certain classes during seventh grade.  He received failing grades in language arts/reading in the first two quarters of the year.  (P-15). The District convened a meeting in the fall of 2010 to discuss A.W.'s performance or behavior in language arts.  (N.T. 296:14-297:16). Notwithstanding a failing grade in social studies during the fourth quarter of that year, A.W. ultimately passed his seventh-grade courses and exhibited improvements in certain subjects during the final quarter.  (S-2).

A.W. also struggled with anxiety during seventh grade.  His anxiety increased during the flu season in January or February 2011 due to his fear of germs.  (N.T. 84:3-15).  A.W. would frequently cry before school and lock himself in the bathroom. (Id. at 89:14-90:4).  A.W. was absent on forty-three days during the 2010-2011 school year, five of which were unexcused.  (S-2)  District attendance records do not reflect that any of A.W.'s absences in seventh grade were due to anxiety.  (S-1 at 2-3).  The District did not offer A.W. any special education support services during the 2010-2011 school year.  (N.T. 90:13-20).

2. *Eighth Grade (2011-2012)*

As the Hearing Officer found, A.W.'s emotional health deteriorated in the beginning of eighth grade. (H.O.D. at 4 ¶ 19). A.W. became increasingly anxious not only about attending school and separating from his parents, but also about large group settings and "what ifs." (N.T. 97:19-98:6). A.W. also struggled with attendance and disciplinary issues during the early part of the year. He was absent on 24.5 days during the first quarter. (P-17).[3] And he received multiple out-of-school suspensions for defiance or disrespect. (P-19 at 1-4). On or around October 12, 2011, A.W.'s mother met with District personnel to discuss A.W.'s absenteeism, behavioral issues, and academic performance. (N.T. 106:16-107:14). A.W.'s first-quarter grades became available in November 2011; he failed four classes and received low passing grades in two others. (Id. at 104:19-24; P-17).

On November 1, 2011, A.W.'s mother called the District and spoke with the District's superintendent and Dr. Lori A. Suski ("Dr. Suski"), then assistant superintendent of the District. (N.T. 246:4-8). A.W.'s mother expressed frustration about the discipline that the District had imposed on A.W. and the District's intention to move him to a co-taught classroom. (Id. at 247:6-249:19). She referenced A.W.'s anxiety issues, noted that A.W. was seeing a therapist, and

---

[3] In September and October 2011, the District sent Parents letters stating that A.W. had been unlawfully absent on a number of days and that a physician must justify each additional absence pursuant to District policy. (P-18 at 1-3). A.W.'s then-therapist, a social worker, submitted a note excusing the absences and conveying that A.W. "is struggling with anxiety and attending counseling to learn to manage his stress." (S-11 at 1). Because A.W.'s therapist was not a physician, the District considered the excuse invalid. (S-8 at 1; S-11 at 1; N.T. 275:10-276:21, 326:5-22).

requested a Section 504 service agreement.  (Id. at 246:20-247:20, 274:25-275:3).  The
District offered a psychiatric evaluation of A.W. during the call.  (See id. at
250:19-251:9; 274:15-24).[4]

On November 4, 2011, the District offered A.W. a Section 504 service
agreement.  Among other accommodations, the service agreement afforded A.W.
opportunities to take breaks from the classroom, make up schoolwork during the
first two periods of the day, and receive additional time on tests and quizzes.  (S-5 at
2).  A.W.'s mother did not attend a scheduled meeting regarding this agreement but
consented to the accommodations therein.  (N.T. 417:6-10; S-5 at 2-3).

A.W.'s mother met with District personnel again on November 22, 2011 to
discuss her son.  She expressed that A.W. requested anger management therapy
and noted that he saw a therapist once or twice per week.  (P-25 at 10).  She also
informed the District that A.W. wished to attend the Dauphin County Technical
School ("DCTS").  (Id.)[5]  The District offered a psychiatric evaluation with Dr.
Shawna A. Brent ("Dr. Brent"), which A.W.'s mother initially declined because A.W.
was already receiving counseling and medication management services.  (Id.; N.T.

_____

[4] During a subsequent phone conversation on or around November 15, 2011,
Dr. Suski again raised the idea of a psychiatric evaluation and informed A.W.'s
mother that the District would cover the costs of the evaluation.  (N.T. 252:21-254:2).
A.W.'s mother indicated that she was not interested in a psychiatric evaluation at
that time.  (Id. at 252:14-21).

[5] A.W. had completed an application to DCTS in November 2011, which the
District submitted on his behalf.  (P-20; N.T. 121:21-124:20).  The application
included a "Teacher Recommendation Form" from an unspecified District
employee, which indicated that A.W. was uncooperative, defiant, unreliable, and
frequently late.  (P-20 at 3).  DCTS notified A.W. in the spring of 2012 that it had
denied his application.  (N.T. 125:9-20).

448:12-23).  The District revised A.W.'s service agreement on November 22, 2011 to add an accommodation for assistance in checking A.W.'s folder for missing assignments.  (S-6 at 1).  A.W.'s mother agreed to this revision.  (Id. at 2-3).  The District did not conduct an evaluation of A.W. before implementing the November 2011 service agreements.  (N.T. 110:12-18).  As the Hearing Officer found, implementation of the service agreements did not sufficiently alleviate A.W.'s anxiety.  (H.O.D. at 5 ¶ 28).  Indeed, A.W.'s school phobia and excessive absences continued unabated.  (N.T. 130:3-131:9, 327:14-16).

On December 13, 2011, the District filed a criminal complaint against A.W. for violation of Pennsylvania's compulsory attendance laws.  (P-18 at 5-6).[6]  The District suspended the truancy proceedings in an effort to secure Parents' consent to a psychiatric evaluation of A.W. for the purposes of obtaining information about his medical condition.  (N.T. 255:12-256:18; S-8 at 1).[7]  During a January 18, 2012 telephone conversation with A.W.'s mother, Dr. Suski again proposed a psychiatric evaluation by Dr. Brent at District expense.  (S-8 at 2).  The District issued a PTE for a psychiatric evaluation that same day.  (S-7).  A.W.'s mother consented to the evaluation on January 24, 2012.  (Id. at 2-3).  She also requested an Individualized Education Program ("IEP") for her son around this time.  (N.T. 135:21-136:2).

---

[6] The complaint names A.W. as defendant, while the summary trial notice names A.W.'s mother as defendant.  (P-18 at 5-7).

[7] In an internal email to District personnel, Dr. Suski acknowledged that "this is a very involved case that has spanned 4 years; not a typical truancy matter." (P-25 at 11).

On February 6 and February 9, 2012, Dr. Brent conducted a psychiatric evaluation of A.W.  Dr. Brent diagnosed A.W. with generalized anxiety disorder (provisional) and oppositional defiant disorder.  (S-13 at 5).  She concluded that A.W. should be identified as a student with an emotional disability under the IDEA and receive special education services in the form of itinerant emotional support. (Id.)  Dr. Brent emphasized that it was in A.W.'s long-term interests to attend school each day and proposed a transition plan whereby A.W. would return to school on a half-time basis and increase his time in the school building each week.  (Id. at 5-6). She also recommended that A.W. be allowed to take breaks from class and that he be subject to discipline for disruptive behavior.  (Id. at 6).  In the event that A.W. did not adhere to this plan, Dr. Brent believed that truancy charges would be appropriate.  (Id.)  In light of Dr. Brent's recommendations, A.W. began attending school for half days in the afternoons.  (N.T. 149:10-151:19).

The District did not revise A.W.'s Section 504 plan or convene an IEP team meeting after receiving Dr. Brent's evaluation report.  (See N.T. 472:6-474:14).  It determined that Dr. Brent's report did not provide enough information to draft an IEP.  (N.T. 450:5-19, 490:10-491:13).  Absent from the evaluation was information from which the District could develop a positive behavior plan, craft IEP goals, or rule out a specific learning disability.  (Id.)  On February 22, 2012, the District issued a PTE for a comprehensive psychoeducational evaluation to determine "whether [A.W.] met the diagnostic criteria to qualify as a student in need of emotional support services."  (S-12 at 4).  A.W.'s mother consented to the second evaluation shortly thereafter.  (Id. at 5).

9

In February 2012, the District informed Parents that A.W. was in jeopardy of failing several courses for the year.  (P-17 at 3).  A.W. also had numerous disciplinary incidents in January and February 2012.  (P-19 at 5-9).  On March 29, 2012, Parents withdrew A.W. from the middle school and enrolled him in Raider Academy, a District-operated online program.  (S-18).  The District cannot prevent students from enrolling in Raider Academy.  (N.T. 257:19-23).  A.W.'s mother decided to change A.W.'s placement to the online program because he was not making sufficient emotional or educational progress at the middle school.  (Id. at 156:16-158:17, 161:25-162:2).  A.W. had few if any interactions with peers or teachers at Raider Academy.  (Id. at 163:17-164:8).  A.W. finished the 2011-2012 school year at Raider Academy and performed well academically.  (Id. at 164:16-18; S-15 at 1).  He had no participation or attendance issues in the program.  (N.T. 373:14-374:5).  The District did not implement a Section 504 plan while A.W. attended Raider Academy. (Id. at 163:13-16).

The District scheduled a comprehensive evaluation for April 26, 2012 with school psychologist Bethany Fratus ("Fratus").  (S-16 at 1).  A.W. refused to attend the evaluation because he did not feel comfortable in the school setting.  (S-17 at 1; N.T. 148:8-149:2).  Fratus offered to reschedule the evaluation and provide various testing accommodations.  (Id.)  A.W. did not attend the rescheduled testing session on May 7, 2012.  (P-25 at 31).  Parents filed a due process complaint in early May 2012.  (See S-16 at 6).  At some point thereafter, the parties agreed to an independent evaluation by Dr. Lee Ann Grisolano ("Dr. Grisolano") (N.T. 452:22-453:4), and the May due process complaint was withdrawn.

### 3.   *Ninth Grade (2012-2013)*

A.W. remained at Raider Academy at the start of his ninth-grade year.  On August 29 and September 5, 2012, Dr. Grisolano evaluated A.W.  (S-20 at 1).  In a thorough report, Dr. Grisolano diagnosed A.W. with anxiety disorder and depressive disorder and agreed with Dr. Brent that A.W. should be classified as a student with an emotional disability due to his anxiety disorder.  (Id. at 14, 16).  Dr. Grisolano also found that A.W. does not have a learning disorder but reasoned that he may have a language processing disorder and advised the District to rule out such a disorder.  (Id. at 11, 14).  She noted that school-based interventions to alleviate A.W.'s anxieties had proved unsuccessful and that A.W. had developed avoidance strategies to cope with anxiety-provoking situations.  (Id. at 10, 13).  Over time, A.W. came to apply these same strategies to escape other undesirable situations.  (Id. at 14).  Dr. Grisolano concluded that "there continues to be a strong behavioral health component to [A.W.'s] presentation, which seems to reflect a mix of anxiety and depressive symptoms."  (Id. at 14).

Despite A.W.'s disability, Dr. Grisolano opined that A.W. was capable of succeeding in a regular education curriculum.  (Id. at 16).  Among other recommendations, Dr. Grisolano reasoned that A.W. should continue therapy and medical treatment, that Parents and educators should avoid overly punitive or permissive responses to A.W.'s aberrant behavior and incentivize the completion of schoolwork, and that the parties should implement a reentry plan to DCTS or Middletown Area High School.  (Id. at 14-16).  Dr. Grisolano stated that A.W. did not require replacement instruction.  (Id. at 16).  Accordingly, any academic goals in his

IEP should include accommodations designed to facilitate A.W.'s attendance and academic performance. (Id.)  Dr. Grisolano also opined that emotional support services should be offered at an itinerant level. (Id.)  The parties received Dr. Grisolano's report on November 5, 2012. (N.T. 25:12-17, 169:6-9).

On December 6, 2012, the parties convened for an IEP team meeting.  The District identified A.W. as a student with an emotional disturbance due to an anxiety disorder manifesting as school phobia. (S-21 at 6).  The IEP offered itinerant emotional support in the form of, *inter alia*, a positive behavior support plan, preferential seating, opportunities to take breaks in an emotional support classroom, sixty minutes per six-day cycle of anxiety-coping instruction in the emotional support classroom, and positive reinforcement. (Id. at 22-23).  With respect to placement, the parties considered a full-time program at Raider Academy, a hybrid program involving both Raider Academy and a regular education setting, full-time regular education at Middletown Area High School, and the addition of emotional support services. (Id. at 25).  The parties rejected a hybrid program and a full-time program at the District's high school. (Id.)  A.W.'s mother approved the IEP on the condition that the District conduct a speech and language evaluation and update A.W.'s IEP accordingly. (S-22 at 3).

The District evaluated A.W. for a speech and language disorder on December 13, 2012. (P-21).  The evaluator noted that A.W.'s testing performance revealed difficulties in certain verbal expression areas and concluded that he should be identified as a student with a speech and language impairment. (Id.)  On December

12

21, 2012, the parties revised A.W.'s IEP to include up to forty minutes per six-day cycle of itinerant speech and language therapy.  (P-22 at 28).

A.W. began attending DCTS on January 28, 2013.  (N.T. 176:13-177:3).  He transitioned to the program relatively well.  (Id. at 177:8-178:4).  The IEP team modified his IEP to reflect this new placement, but the special education services offered remained largely unchanged.  (S-23).  A.W.'s mother agreed to the revisions.  (S-24 at 3).  On February 26, 2013, Parents moved to a different school district, although A.W. remained a student at DCTS.  (N.T. 8:25-9:11, 183:8-183:24).  A.W.'s March 15, 2013 IEP at DCTS found evidence of "gaps" between what A.W. learned in Algebra 1 while attending Raider Academy and DCTS's algebra curriculum.  (S-24 at 5).

### B.    The Hearing Officer's Decision

The due process hearing consisted of three sessions between April 17, 2013 and May 13, 2013.  The Hearing Officer received testimony from A.W.'s mother, District administrators and staff, a District psychologist, and an educator from Raider Academy.  The primary issues in this dispute, according to the Hearing Officer, were whether the District failed to comply with its "Child Find" duties under the IDEA and Section 504, whether the District failed to offer A.W. a FAPE in the least restrictive environment, and whether A.W. was entitled to compensatory education.  (H.O.D. at 1-2).  The time period relevant to the due process proceeding spanned from the beginning of the 2010-2011 school year to February 26, 2013, when Parents withdrew A.W. from the District.  In a June 15, 2013 decision, the Hearing Officer found in favor of the District on each issue.

The Hearing Officer found no evidence of a disability during the 2010-2011 school year that would have placed the District on notice that A.W. required special education services.  (Id. at 11).  A.W.'s prior mental health issues, according to the Hearing Officer, did not require continued intervention by the District, especially in light of A.W.'s academic progress and the lack of significant behavioral issues during seventh grade.  (Id. at 14).

With respect to the 2011-2012 school year, by contrast, the Hearing Officer found that educational issues arose early in the year and required District intervention.  Among other "red flags," the Hearing Officer pointed to A.W.'s frequent absences, his increasingly disruptive behavior, and his poor academic performance.  (Id. at 14).  According to the Hearing Officer, these red flags became apparent to all parties by November 1, 2011, around the time that A.W.'s first-quarter grades became available.  (Id.)  The Hearing Officer concluded that the District responded to A.W.'s issues in a reasonable manner.  (Id. at 15).  He noted that the District offered to conduct a psychiatric evaluation of A.W., which A.W.'s mother initially refused, and implemented interim Section 504 service agreements. (Id.)

The Hearing Officer agreed with plaintiffs that, by failing to offer a comprehensive psychoeducational evaluation until completion of the psychiatric evaluation in February 2012, the District engaged in an "unnecessary two-step process in conducting its evaluation."  (Id. at 16).  The Hearing Officer reasoned that if the District had issued a PTE for a comprehensive evaluation by November 1, 2011, then the parties could have finalized an IEP by March 24, 2012.  (Id.)

14

Because the District failed to do so, "from March 24, 2012 until the end of the eighth grade school year, [A.W.] did not receive needed educational supports and services." (Id.)

However, the Hearing Officer declined to award any compensatory education. He reasoned that because Parents removed A.W. from the brick-and-mortar classroom in March 2012 and enrolled him in an online program, they "deprived [A.W.] of the fruits of a faster evaluation." (Id. at 16). He noted that compensatory education is an equitable remedy and opined that it would be unreasonable to fault the District's evaluation process when A.W.'s mother delayed the psychiatric evaluation for several weeks. (Id. at 17). The Hearing Officer also concluded that the District did not violate Section 504 during the 2011-2012 school year. (Id.) With respect to credibility, the Hearing Officer found that A.W.'s mother's testimony regarding the 2011-2012 school year was "somewhat embellished" and accorded less weight to her factual assertions. (Id. at 15).

Finally, the Hearing Officer held that the District did not deny A.W. a FAPE in the least restrictive environment during his ninth-grade year. He reasoned that any subsequently discovered academic deficiencies were likely attributable to A.W.'s absenteeism. (Id. at 19). And because Parents made the decision to enroll him in Raider Academy, the District could not be held responsible for the restrictive environment of that placement. (Id.)

### C.   Procedural History

Plaintiffs filed a complaint in this court on September 13, 2013. (Doc. 1). Pursuant to the IDEA, any party aggrieved by the outcome of a due process hearing

may commence an action in a federal district court without regard to the amount in

controversy.  20 U.S.C. § 1415(i)(2)(A).  In addition to bringing causes of action

under the IDEA and Section 504, plaintiffs state a new claim for violation of the

ADA.  Plaintiffs' Section 504 and ADA claims are derivative of their IDEA claim and

are predicated on the same alleged denial of a FAPE.  (See Doc. 1 ¶¶ 42, 53; N.T.

31:4-12).

On January 29, 2014, plaintiffs moved pursuant to 20 U.S.C. § 1415(i)(2)(C)(ii)

to introduce A.W.'s Section 504 service agreement from PA Cyber.  (Doc. 13).  This

service agreement offered accommodations from January 27, 2010 to January 26,

2011.  (Doc. 14-1, Ex. A).  Over the District's objection, the court admitted the

agreement to the record.  (Doc. 18).

On June 6, 2014, both parties moved for judgment on the supplemented

administrative record.  (Docs. 19, 21).  On appeal, plaintiffs seek reversal of the

Hearing Officer's decision with respect to the 2011-2012 school year and the

2012-2013 school year through February 26, 2013, as well as full days of

compensatory education during this period.  (Doc. 1 at 24).[8]  The District requests

---

[8] Plaintiffs' complaint seeks reversal of the Hearing Officer's decision and
compensatory education through January 28, 2013—the date that A.W. matriculated
at DCTS.  (Doc. 1 at 24).  In their motion for judgment on the supplemented
administrative record, however, plaintiffs extend their request for relief through
February 26, 2013.  (Doc. 21 at 3).  Because plaintiffs exhausted their IDEA and
Section 504 claims through February 26, 2013 at the administrative level (H.O.D. at
1-2), and because the District seeks affirmance of the Hearing Officer's decision in
its entirety (Doc. 20 at 20), the court will consider plaintiffs' claims through
February 26, 2013 for the purposes of this memorandum.

that the court affirm the Hearing Officer's decision.  (Doc. 20 at 1).  The cross-motions have been fully briefed and are ripe for disposition.[9]

## II.   **Legal Standard**

When reviewing state administrative decisions under the IDEA, a district court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C § 1415(i)(2)(C).  The Court of Appeals for the Third Circuit has described this standard as "modified *de novo*" review under which the district court must give "due weight" to the findings of the hearing officer.  P.P. *ex rel.* Michael P. v. W. Chester Area Sch. Dist., 585 F.3d 727, 734 (3d Cir. 2009).  Pursuant to this standard,  the hearing officer's factual findings should be considered *prima facie* correct; if the district court does not accept those findings, it is obligated to explain why.  S.H. v. State-Operated Sch. Dist. of Newark, 336 F.3d 260, 270 (3d Cir. 2003); see also Carlisle Area Sch. v. Scott P., 62 F.3d 520, 527 (3d Cir. 1995) (noting that district courts are free to accept or reject administrative findings of fact but must justify any departures from the agency's decision).  A district court must also accept the hearing officer's credibility determinations "unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion or unless the record read in its entirety would compel a contrary conclusion." S.H., 336 F.3d at

---

[9] Plaintiffs also requested oral argument on the parties' cross-motions.  (Doc. 25).  Given the parties' extensive briefing, the court will resolve the motions without oral argument.

270 (quoting <u>Carlisle</u>, 62 F.3d at 529).  If the district court accepts additional evidence, it may "accept or reject the agency findings depending on whether those findings are supported by the new, expanded record and whether they are consistent with the requirements of the [IDEA]." <u>Id.</u> (quoting <u>Oberti v. Bd. of Educ. of Borough of Clementon Sch. Dist.</u>, 995 F.2d 1204, 1220 (3d Cir. 1993)).

A district court's review of the hearing officer's application of legal standards and conclusions of law is plenary.  <u>Jana K. *ex rel.* Tim K. v. Annville-Cleona Sch. Dist.</u>, No. 13-CV-0115, __ F. Supp. 2d __, 2014 WL 4092389, at *6 (M.D. Pa. Aug. 18, 2014) (citing <u>Warren G. v. Cumberland Cnty. Sch. Dist.</u>, 190 F.3d 80, 83 (3d Cir. 1999)).  The hearing officer's conclusions regarding compensatory education are accordingly subject to plenary review.  <u>P.P.</u>, 585 F.3d at 735.  The reviewing court should not, however, "substitute its own notions of sound educational policy for those of local school authorities." <u>S.H.</u>, 336 F.3d at 270 (citation omitted).  Subject to the foregoing standards, the district court may make findings by a preponderance of the evidence and grant appropriate relief, including attorneys' fees and compensatory education.  <u>D.S. v. Bayonne Bd. of Educ.</u>, 602 F.3d 553, 564 (3d Cir. 2010).[10]

---

[10] The Third Circuit has not determined what standard of review governs Section 504 claims under the Rehabilitation Act.  <u>T.F. v. Fox Chapel Area Sch. Dist.</u>, No. 12CV1666, 2013 WL 5936411, at *9 (W.D. Pa. Nov. 5, 2013), <u>aff'd</u>, No. 13-4624, __ F. App'x __, 2014 WL 4674635 (3d Cir. Sept. 22, 2014).  In the exercise of caution, the court notes that its holding with respect to plaintiffs' Section 504 claim would remain the same under either the *de novo* standard or the modified *de novo* standard.

The party challenging the appropriateness of an IEP bears the burden of persuasion at the administrative level. L.E. v. Ramsey Bd. of Educ., 435 F.3d 384, 391-92 (3d Cir. 2006) (citing Schaffer v. Weast, 546 U.S. 49 (2005)).  On appeal before the district court, the burden of persuasion lies with the party challenging the administrative decision.  Ridley Sch. Dist. v. M.R., 680 F.3d 260, 270 (3d Cir. 2012). In the case *sub judice*, plaintiffs bear the burden of demonstrating that the Hearing Officer's decision was erroneous.

## III.   Discussion

Plaintiffs bring claims under the IDEA, Section 504, Pennsylvania law implementing the IDEA and Section 504, and the ADA.  Although plaintiffs' Section 504 and ADA claims are derivative of their IDEA claims (see Doc. 1 ¶¶ 42, 53; N.T. 31:4-12), the court will address each cause of action *seriatim*.

### A.   IDEA and Chapter 14

Under the IDEA, children with disabilities must "have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A).  The IDEA requires that state and local agencies establish certain procedural safeguards to guarantee that eligible children receive a FAPE.  Id. § 1415(a).  As the Supreme Court has stated, "the importance Congress attached to these procedural safeguards cannot be gainsaid." Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley, 458 U.S. 176, 205 (1982).  Among other safeguards, local agencies must implement a system "to identify, locate, and evaluate all

19

children in the state who have disabilities and need special education and related services." P.P., 585 F.3d at 730 (citing 20 U.S.C. § 1412(a)(3)).  These requirements are known as a school district's "Child Find" obligations.  As part of the Child Find process, a district must comprehensively evaluate any student it reasonably suspects of having a disability under the IDEA.  P.P., 585 F.3d at 738; see also 20 U.S.C. § 1414(a)(1)(A).

After a district identifies a child who requires special education and related services, it must develop an IEP for that child.  20 U.S.C. § 1412(a)(4).  An IEP is the "primary vehicle for providing students with the required free and appropriate education."  S.H., 336 F.3d at 264.  It must be reasonably calculated to allow a student to receive "meaningful educational benefits" in light of the student's intellectual potential.  Shore Reg'l High Sch. Bd. of Educ. v. P.S. ex rel. P.S., 381 F.3d 194, 198 (3d Cir. 2004) (quoting Polk v. Cent. Susquehanna Intermediate Unit 16, 853 F.2d 171, 181 (3d Cir. 1988)).  An IEP provides meaningful educational benefits when it offers the student an opportunity to make behavioral, social, and emotional progress.  Breanne C. v. S. York Cnty. Sch. Dist., 732 F. Supp. 2d 474, 483 (M.D. Pa. 2010) (citing M.C. ex rel. J.C. v. Cent. Reg'l Sch. Dist., 81 F.3d 389, 394 (3d Cir. 1996)).  However, the IEP need only offer a "basic floor of opportunity." Carlisle, 62 F.3d at 533-34.  A district is not required to "maximize the potential of handicapped children."  T.R. v. Kingwood Twp. Bd. of Educ., 205 F.3d 572, 577 (3d Cir. 2000) (quoting Rowley, 458 U.S. at 189-90, 197 n.21).

The IDEA also contains a "mainstreaming" requirement under which districts must place disabled students in the least restrictive environment ("LRE")

that will confer a meaningful educational benefit.  L.E., 435 F.3d at 390 (quoting

T.R., 205 F.3d at 578); see also 20 U.S.C. § 1412(a)(5)(A).  The LRE is the

environment that, to the maximum extent possible, "satisfactorily educates disabled

children together with children who are not disabled, in the same school the

disabled child would attend if the child were not disabled."  Carlisle, 62 F.3d at 535.

Chapter 14 of the Pennsylvania Code incorporates and implements the

substantive provisions of the IDEA.  See 22 PA. CODE § 14.102(a).  Chapter 14

codifies additional standards and regulations regarding, *inter alia*, the state's Child

Find, evaluation, and IEP obligations.  Id. §§ 14.121, 14.123, 14.131.[11]  The court's

analysis of plaintiffs' Chapter 14 claim is subsumed by its analysis of their IDEA

claim.

### 1.   *Child Find Requirement*

The court first considers whether the District complied with its Child Find

obligations under the IDEA.  A school district must evaluate a student for special

education services after the district is "on notice of behavior that is likely to indicate

a disability."  Ridley, 680 F.3d at 271 (quoting W.B. v. Matula, 67 F.3d 484, 501 (3d

Cir. 1995)).  Plaintiffs contend that the District was on notice that A.W. suffered

from a disability no later than the beginning of the 2011-2012 school year.  (Doc. 22

at 8).  They point to the Hearing Officer's findings with respect to A.W.'s anxiety,

---

[11] To the extent that any state standards exceed the requirements of the
IDEA, those standards are incorporated into the IDEA.  Colon *ex rel.* Disen-Colon v.
Colonial Intermediate Unit 20, 443 F. Supp. 2d 659, 681 (M.D. Pa. 2006) (citing Geis
v. Bd. of Educ. of Parsippany-Troy Hills, Morris Cnty., 774 F.2d 575, 581 (3d Cir.
1985)).  In Pennsylvania, school districts are responsible for complying with the
IDEA's Child Find requirements.  22 PA. CODE §§ 14.102(b), 14.121(a).

absenteeism, school avoidance, failing grade in social studies, and suspension due to defiant behavior in seventh grade.  (Id.)  They also note that the Hearing Officer found that certain "red flags" appeared toward the beginning of eighth grade.  (Id. at 6).  The Hearing Officer concluded that these red flags did not become sufficiently apparent to the District until November 1, 2011.  (H.O.D. at 14-16).

The court accepts this finding.  A school district does not necessarily violate its Child Find obligations when it fails to identify a student as disabled at the "earliest possible moment."  D.K. v. Abington Sch. Dist., 696 F.3d 233, 249 (3d Cir. 2012).  To be sure, the record indicates that A.W. experienced anxiety during seventh grade.  A.W.'s mother testified that A.W. had difficulty attending school due to anxiety and informed Cook about A.W.'s anxiety issues.  (N.T. 89:14-90:12, 294:24-295:2).[12]  The court also recognizes that A.W.'s anxiety increased significantly in the beginning of eighth grade and that A.W. was absent on an alarming number of days in the first quarter.  (N.T. 97:19-98:6; P-17).  Moreover, A.W.'s mother met with the District in October 2011 to discuss A.W.'s difficulties in school.  (N.T. 106:16-107:14).

Notwithstanding this earlier evidence of a potential IDEA-qualifying disability, the record supports the Hearing Officer's finding that the District's duty to evaluate A.W. was not triggered until November 1, 2011.  First, A.W.'s final grades for the first quarter, which included four failing grades, ostensibly were not available until November 2011.  (P-17 at 1; N.T. 104:19-24).  Second, A.W.'s mother

---

[12] The court notes that A.W's 2010-2011 attendance records do not identify anxiety as the basis for his absences.  (S-1 at 2-3).

did not contact Dr. Suski and the District's superintendent until November 1 to discuss her concerns with reasonable specificity. (See N.T. 246:20-247:20, 274:25-275:3). According due weight to the Hearing Officer's factual findings, the court concludes that the District was on notice that A.W. likely qualified for special education services as of November 1, 2011.[13]

Once a school district is on notice of a likely disability, it must evaluate the student within a "reasonable time." D.K., 696 F.3d at 250 (quoting Ridley, 680 F.3d at 271). The Third Circuit has declined to apply any bright-line rules to this standard. W.B., 67 F.3d at 501, abrogated on other grounds by A.W. v. Jersey City Pub. Sch., 486 F.3d 791 (3d Cir. 2007). In W.B., the Third Circuit held that a reasonable juror could conclude that a delay of six months between notice and referral for an evaluation constituted a violation of the school district's Child Find duties. Id. A school district commits a procedural violation of the IDEA when it improperly delays an evaluation. D.K., 696 F.3d at 250.

The IDEA requires a "full and individual" evaluation before the initial provision of special education services. 20 U.S.C. § 1414(a)(1)(A). The evaluation should employ "a variety of assessment tools and strategies to gather relevant

---

[13] In light of this finding, the court need not consider the District's contention that A.W. was necessarily ineligible for educational services under the IDEA and Section 504 at the beginning of the 2011-2012 school year. (See Doc. 20 at 8). The court notes with interest the District's acknowledgment that "early in the year it should have—and did—become obvious to the school that [A.W.] might be in need of special education services." (Id.) The court further notes that the District's suggestion that A.W.'s mother did not inform the District about A.W.'s counseling and medication (id. at 11) is wholly unsupported by the record (see, e.g., P-7 at 1; P-25 at 10).

functional, developmental, and academic information" that enable the school district to determine whether a student has a qualifying disability and the content of that student's IEP.  Id. § 1414(b)(2)(A).  Before conducting an initial evaluation, the district must obtain informed parental consent.  Id. § 1414(a)(1)(D).[14]  After obtaining consent, the district must conduct the evaluation and issue an evaluation report within sixty calendar days, excluding any days during the summer.  Id. § 1414(a)(1)(C)(i); 22 PA. CODE § 14.123(b).

The Hearing Officer found that the District unduly delayed the implementation of an IEP by failing to issue a PTE for a comprehensive psychoeducational evaluation until after the District received Dr. Brent's psychiatric evaluation report in February 2012.  (H.O.D. at 16).  According to the Hearing Officer, the District should have issued a PTE for a comprehensive evaluation in November 2011.  (Id.)  Because the District engaged in "an unnecessary two-step process in conducting its evaluation," it deprived A.W. of "needed educational supports and services."  (Id.)  To the extent that the Hearing

---

[14] If a student's parents do not consent to an initial evaluation, the school district may file a due process complaint.  20 U.S.C. § 1414(a)(1)(D)(ii)(I).

Officer found that the District's unnecessary delay in conducting a comprehensive

evaluation constituted a violation of its Child Find obligations,[15] the court agrees.[16]

Despite this observation, the Hearing Officer incongruously concluded that

the District "responded reasonably" after November 1, 2011. (H.O.D. at 15). The

court rejects this finding. The Hearing Officer noted that the District believed that

a psychiatric evaluation of A.W. was necessary to assess the causes of his anxiety.

(Id.) He reasoned that the District had offered to conduct a psychiatric evaluation

in October 2011 but that A.W.'s mother "blocked" this evaluation from occurring

---

[15] The Hearing Officer's decision contains contradictory conclusions regarding whether the District violated the IDEA's Child Find requirements. (Compare H.O.D. at 15 ("I do not find that the District failed in its child find obligations from the beginning of the school year until February 22, 2012, by which time the psychiatric evaluation report had been received."), with id. at 20 ("I conclude that the District did not fail to comply with its child find obligations, except to the extent that it failed to issue a PTE for a comprehensive educational evaluation until after receipt of the psychiatric report.")).

[16] The District's justification for its multistep evaluation process is wholly unpersuasive. Fratus testified that conducting a psychiatric evaluation before a comprehensive evaluation can expedite the overall evaluation process because "oftentimes it can take several weeks to several months to get in to see a psychiatrist." (N.T. 488:21-490:4). If the District had initiated a psychiatric evaluation after completion of a comprehensive evaluation, according to Fratus, the parties would have had to wait several additional months to obtain the psychiatric report and then reissue a PTE to incorporate that additional information. (Id. at 489:17-490:4 ("Rather than having to do kind of two separate processes, it can all be done at one time.")). Fratus failed to explain what efficiencies the District gained from its evaluation time line that it would not have gained had it sought permission for both evaluations on November 1, 2011. As it turned out, the District did not schedule a comprehensive evaluation for A.W. until approximately two months after A.W.'s mother consented to the second PTE. (S-12; S-16 at 1). In contrast to Fratus's testimony, the record reveals that the District's time line resulted in separate evaluation processes that delayed the development of A.W.'s IEP.

until February 2012.  (Id. at 14-15).[17]  The court acknowledges that A.W.'s mother agreed only to consider a psychiatric evaluation on November 1, 2011 and verbally declined the evaluation later that month.  (N.T. 251:15-253:21, 448:12-23).  But the record indicates that the District failed clearly to inform Parents that the psychiatric evaluation was a necessary measure for special education services under the IDEA.  (See, e.g., S-8 at 2 ("The results of the psychiatric evaluation would be used by the District to revise [A.W.'s] Chapter 15 plan to specifically include educational recommendations for the staff as to how to best work with [A.W.] to help him attend school and succeed."); P-25 at 10 (discussing the psychiatric evaluation without reference to an IEP or the IDEA)).  It is readily apparent that A.W.'s mother believed that a psychiatric evaluation would be superfluous in light of A.W.'s existing counseling services.  (P-25 at 10; N.T. 448:12-23).

A.W.'s mother's verbal rejection of the psychiatric evaluation did not absolve the District of its Child Find responsibilities.  To be sure, a school district is entitled to a certain degree of cooperation from a disabled student's parents.  C.H. v. Cape Henlopen Sch. Dist., 606 F.3d 59, 69 (3d Cir. 2010) ("[W]e decline to hold that a school district is liable for procedural violations that are thrust upon it by uncooperative parents."); (cf. H.O.D. at 9 ("Even if parents do not cooperate fully with district efforts to identify a student, it is still the responsibility of the school to

---

[17] Contrary to the Hearing Officer's decision, the record does not support a finding that the District offered a psychiatric evaluation before November 1, 2011. (See, e.g., N.T. 250:2-251:9; P-25 at 11).  Indeed, the District concedes that it first recommended a psychiatric evaluation in early November 2011.  (Doc. 20 at 9).

identify those children who are in need of the IDEA's protections." (citing <u>Taylor v.</u>
<u>Altoona Area Sch. Dist.</u>, 737 F. Supp. 2d 474, 484 (W.D. Pa. 2010)))).  In <u>C.H.</u>, the
Third Circuit found that a district's failure to develop an IEP by the first day of
classes—a technical violation of the IDEA—was not actionable when the disabled
student's parents delayed a continuation of the IEP meeting and when this violation
did not result in any loss of educational benefits for the student.  606 F.3d at 68-70.
In the instant matter, by contrast, the district failed to take the necessary first step
in this cooperative process: the issuance of a PTE.  Notwithstanding A.W.'s
mother's initial verbal rejection of the psychiatric evaluation, the District was
required "to put all other considerations aside and to notify [Parents] in writing that
it believed an evaluation was needed, provide a written description of the proposed
evaluation, seek consent, and provide a procedural safeguards notice."  <u>See</u> <u>Jana K.</u>,
2014 WL 4092389, at *15.  It failed to do so until January 18, 2012.  (S-7).[18]

Once the District issued a PTE for a psychiatric evaluation, A.W.'s mother
consented within short order.  (<u>Id.</u> at 2-3).[19]  Yet after Dr. Brent concluded that A.W.
should receive itinerant emotional support services under the IDEA (S-13 at 5), the
District failed to convene an IEP team meeting or develop an initial IEP until the

---

[18] In light of this failure, it was erroneous for the Hearing Officer to hold
A.W.'s mother responsible for the delayed initiation of a comprehensive evaluation
on the grounds that she held up the psychiatric evaluation.  (<u>See</u> H.O.D. at 16).

[19] The PTE stated that "[i]f your child is determined to be eligible for special
education, you will be invited to participate in developing an Individualized
Education Program (IEP) that will include those programs and services your child
needs to succeed in school" (S-7 at 1 (emphases omitted)), explicitly connecting the
psychiatric evaluation with the provision of special education and related services
under the IDEA.

following school year.  See 34 C.F.R. § 300.323(c) (requiring that local agencies hold a meeting to develop an IEP for a child within thirty days after a determination that the child requires special education services).  The court recognizes that the psychiatric evaluation did not yield enough information about A.W.'s needs for the parties to implement a final IEP.  See 20 U.S.C. § 1414(b)(2)(A) (requiring school districts to use "a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information").  The record reveals, however, that the District's psychiatric evaluation was not structured to provide a "full and individual" evaluation.  (Compare S-7 at 1 (stating that the evaluation will consist only of a psychiatric evaluation), with S-12 at 4 (identifying, *inter alia*, a psychoeducational evaluation, a functional behavior assessment, behavior rating scales, and social/emotion rating scales)); see also Keystone Cent. Sch. Dist. v. E.E. *ex rel.* H.E., 438 F. Supp. 2d 519, 524-25 (M.D. Pa. 2006) (affirming decision of Appeals Panel to reverse reduction of compensatory education award on the grounds that a psychiatric evaluation was not essential to the development of an IEP).

The court finds that the District knew that a comprehensive evaluation would still be necessary at the time that it issued a PTE for a psychiatric evaluation in January 2012.  By neglecting to initiate a comprehensive evaluation as contemplated by the IDEA until February 22, 2012—nearly four months after it suspected that A.W. qualified for special education services—the District unreasonably delayed the evaluation process.  Accordingly, the court concludes that the District violated its Child Find obligations to A.W. under the IDEA.

## 2.    *FAPE Requirement*

A school district's failure to comply with the Child Find requirement constitutes a procedural violation of the IDEA.  See D.K., 696 F.3d at 249.  However, procedural violations are not necessarily actionable.  A procedural violation constitutes a denial of a FAPE only if the violation causes "substantial harm" to the disabled child or his parents.  C.H., 606 F.3d at 66 (quoting Knable *ex rel.* Knable v. Bexley City Sch. Dist., 238 F.3d 755, 765 (6th Cir. 2001)); accord D.S., 602 F.3d at 565 ("A procedural violation is actionable under the IDEA only if it results in a loss of educational opportunity for the student, seriously deprives parents of their participation rights, or causes a deprivation of educational benefits.").  The availability of compensatory education for a procedural violation of the IDEA is likewise contingent on whether the violation caused a substantive denial of a FAPE. D.K., 696 F.3d at 250 n.6.

In a contradictory fashion, the Hearing Officer found that "from March 24, 2012 until the end of the eighth grade school year, [A.W.] did not receive needed educational supports and services because the District chose an unnecessary two-step process in conducting its evaluation," but that this process did not deny A.W. a FAPE.  (H.O.D. at 16, 20).  According to the Hearing Officer, the District's lengthy evaluation process did not result in a loss of educational benefits "because the Parent would have deprived [A.W.] of the fruits of a faster evaluation by removing [A.W.] from the District's building at about the same time that the IEP would have been ready."  (Id. at 16).

This conclusion is factually and legally erroneous.  First, as explained *supra*, the District acted unreasonably in failing to issue a PTE for the psychiatric evaluation sooner.  The Hearing Officer therefore erred in calculating that, due to her initial verbal rejection of the psychiatric evaluation, A.W.'s mother delayed the development of any IEP until March 24, 2012.[20]  Second, the provision of essential special education services in A.W.'s eventual IEPs was not dependent on A.W.'s placement in a brick-and-mortar school.  Indeed, A.W.'s December 2012 IEPs offered sixty minutes per six-day cycle of emotional support services—a central component of the IEPs—regardless of whether A.W. returned to a physical school or remained in the District's online program.  (S-21 at 26).[21]  Finally, because A.W. remained a District student while attending Raider Academy, the IDEA demanded that the District continue to provide A.W. a FAPE during this placement.  Under the logic of the Hearing Officer's decision, the District's substantive FAPE obligations to A.W. ceased when he enrolled in Raider Academy.  The court rejects this inference.

---

[20] The District cites <u>L.S. *ex rel.* K.S. v. Abington School District</u>, No. 06-5172, 2007 WL 2851268, at *11-12 (E.D. Pa. Sept. 28, 2007), in support of the Hearing Officer's finding that the District could not have offered an IEP before March 24, 2012.  (Doc. 20 at 11).  In relevant part, <u>L.S.</u> concerns appropriate evaluation methodologies rather than evaluation timing requirements.  <u>L.S.</u> is therefore inapposite to the present analysis.

[21] The Hearing Officer also found that "[t]here is no reason to believe that, if the IEP had been in place in March, [A.W.] would have been present every day to take advantage of it."  (H.O.D. at 17).  The court agrees that A.W. may have continued to struggle with attendance in the brick-and-mortar setting with appropriate emotional supports in place.  But this observation has no bearing on the District's obligation to offer an IEP that conferred meaningful educational benefits, regardless of whether A.W. were physically present each day to reap those benefits.

Courts in this circuit have held that a protracted failure to evaluate and to offer an IEP to a student reasonably suspected of having a disability may deny that student a FAPE. In <u>Jana K.</u>, the student exhibited signs of an emotional disturbance throughout her seventh- and eighth-grade school years, including depression, self-injurious behavior, frequent visits to the guidance counselor and nurse, poor academic performance, and absenteeism. 2014 WL 4092389, at *1-4. The school district offered the student certain services to improve her grades but failed to refer her for a special education evaluation. <u>Id.</u> at *3. At the end of the 2010-2011 school year, the student's father withdrew her from the district and enrolled her in a cyber school. <u>Id.</u> at *4. After affirming the hearing officer's decision that the school district committed a Child Find violation, this court concluded that the district's violation affected the student's substantive right to a FAPE between February 2010 and the end of the 2010-2011 school year—the statutory period at issue. <u>Id.</u> at *14. As the court explained, the student "was entitled to a timely evaluation and that never occurred. As a result, she did not receive an IEP and suffered both emotionally and academically." <u>Id.</u>

Similarly, in <u>O.F. *ex rel.* N.S. v. Chester Upland School District</u>, the United States District Court for the Eastern District of Pennsylvania denied the school district's motion for summary judgment with respect to a denial of a FAPE. 246 F. Supp. 2d 409, 417 (E.D. Pa. 2002). It found that the district was on notice that the student likely had a disability in January 1997 and referred her for an evaluation the following month, but that it failed to complete a comprehensive evaluation until November 1997 or implement an IEP until December 1997. The court held that "a

reasonable factfinder could conclude that a denial of FAPE occurred because no evaluation of O.F. was completed and no IEP was in place within a reasonable time after school officials were on notice of her behavior that was likely to indicate a disability." Id. at 418.

In the case *sub judice*, the District does not dispute that A.W. was entitled to special education and related services under the IDEA. (See N.T. 9:12-20; 27:24-28:2).[22] Yet despite receiving notice that A.W. likely required those services by November 1, 2011, the District failed to offer A.W. an initial IEP until December 6,

---

[22] Although the Hearing Officer did not make an explicit finding regarding A.W.'s eligibility under the IDEA, he acknowledged A.W.'s "history of legally recognized disability" and found that A.W. did not receive "needed educational supports and services" during a portion of the 2011-2012 school year. (H.O.D. at 14, 16). In light of Dr. Brent's and Dr. Grisolano's evaluation reports—both of which concluded that A.W. should be classified as a student with an emotional disability (S-13 at 5; S-20 at 16)—and other, substantial record evidence of disability (see, e.g., S-11; S-21; P-17; P-24; P-25 at 10), the court finds that A.W. had an emotional disturbance within the meaning of the IDEA during the relevant time period.

2012—over *thirteen* months later.[23]  While he remained in the brick-and-mortar

setting, A.W.'s anxieties persisted, his academic performance worsened, and his

absenteeism increased.  A.W. had no access to anxiety-coping instruction or to the

other services that an emotional support classroom might offer.  Nor did he receive

necessary therapy to treat his speech and language disorder.  The limited

accommodations that the District offered in A.W.'s Section 504 service agreements

had little, if any, ameliorative effect—which became quite clear to both parties

shortly after their implementation.[24]  The lack of educational progress and sufficient

emotional supports caused A.W.'s mother to remove him from the middle school

---

[23] The Hearing Officer failed to address whether A.W.'s December 2012 IEPs were reasonably calculated to confer meaningful educational benefits on A.W. at the time they were offered.  The District correctly notes that plaintiffs failed to challenge the appropriateness of A.W.'s IEPs at the due process hearing.  (See Doc. 20 at 18).  In a footnote in their supporting brief, plaintiffs enumerate several alleged shortcomings of A.W.'s IEPs.  (Doc. 22 at 13 n.12).  Assuming *arguendo* that plaintiffs exhausted these arguments, the court finds that any deficiencies in A.W.'s December 2012 IEPs did not themselves result in a substantive denial of a FAPE.  The IEPs are comprehensive in nature and meaningfully incorporate the recommendations of Dr. Brent and Dr. Grisolano.  (See S-21; P-22).

To the extent that plaintiffs contend that the District denied A.W. a FAPE with respect to his ninth-grade algebra education (see Doc. 22 at 5 n.5), the court accepts the Hearing Officer's finding that A.W.'s deficits in algebra comprehension were just as likely attributable to his attendance issues as to any inadequacies in the District's online curriculum (H.O.D. at 19).  As the District noted, A.W.'s March 2013 IEP concluded that A.W.'s absences from DCTS may have contributed to these deficits.  (See P-24 at 5).  For the reasons identified in this memorandum, the court rejects the Hearing Officer's conclusion that the District provided A.W. a FAPE through December 2012.

[24] The District concedes that the service agreements ultimately did not meet A.W.'s needs.  (Doc. 20 at 10).

and enroll him in Raider Academy.[25]  As in <u>Jana K.</u>, A.W. was entitled to a

comprehensive evaluation and an IEP during eighth grade, but neither occurred

until the following year.[26]  According due weight to the Hearing Officer's factual

findings, the court finds by a preponderance of the evidence that the District's delay

deprived A.W. of necessary educational benefits and resulted in substantive harm.

The court thus reverses the Hearing Officer's decision and holds that the District

denied A.W. a FAPE under the IDEA from November 1, 2011 until the District

---

[25] Insofar as plaintiffs argue that the District violated the IDEA's mainstreaming requirement by failing to educate A.W. in the least restrictive environment (<u>see</u> Doc. 22 at 13 n.12), the court rejects this contention.  Neither party disputes that Raider Academy is a more restrictive environment than the District's physical schools.  As the Hearing Officer found, however, A.W.'s mother unilaterally enrolled him in the online program.  (H.O.D. at 19).  Because the District did not propose this placement and could not prevent it (N.T. 257:19-23), it would be unreasonable to hold the District responsible for a LRE violation.  This conclusion does not absolve the District of its Child Find and FAPE responsibilities to A.W.  <u>See</u> <u>Michael J. v. Derry Twp. Sch. Dist.</u>, No. 103CV1104, 2006 WL 148882, at *26 (M.D. Pa. Jan. 19, 2006) ("[O]ffering a child education within the least restrictive environment is not a substitute for offering FAPE.").  To the extent that the District denied A.W. a FAPE while attending the District's online program, recourse is available under the IDEA.

[26] The undisputed fact that A.W. refused to attend the scheduled testing sessions on April 26, 2012 and May 7, 2012 does not absolve the District of its obligation to provide a FAPE.  A.W.'s mother signed the PTE for a comprehensive evaluation in February 2012 and did not impede the evaluation.  The court does not fault the District for A.W.'s refusal and commends Fratus for her willingness to accommodate A.W.'s unique needs.  Nevertheless, the District was aware that A.W. suffered from anxiety and school phobia and thus could reasonably anticipate scheduling issues with a District-run evaluation, just as A.W. had difficulties attending school earlier in the year due to his anxiety.  This case is therefore distinguishable from <u>Mary T. v. School District of Philadelphia</u>, in which the Third Circuit held that a student's "acute medical condition"—which prevented her from being evaluated—suspended the school district's obligation to provide a FAPE.  <u>See</u> 575 F.3d 235, 249-51 (3d Cir. 2009).  As demonstrated by Dr. Grisolano's subsequent evaluation, A.W.'s condition did not foreclose the possibility of a comprehensive evaluation while he attended Raider Academy.

provided special education services in connection with A.W.'s December 2012 IEPs.[27]  A.W. is entitled to relief for this period of deprivation.

### B.    Section 504 and Chapter 15

Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).  As the Third Circuit has explained, Section 504's "negative probation" on disability discrimination is substantially similar to the IDEA's "affirmative duty."  Ridley, 680 F.3d at 280 (quoting W.B., 67 F.3d at 492-93).  Like the IDEA, Section 504 entitles disabled students to a FAPE. 34 C.F.R. § 104.33(a) ("A recipient that operates a public elementary or secondary education program or activity shall provide a free appropriate public education to

---

[27] The court has accorded appropriate deference to the Hearing Officer. Specifically, the court has relied substantially on the Hearing Officer's findings of fact and record evidence consistent with those findings.  The court also accepts the Hearing Officer's determinations that A.W.'s mother's testimony contained some degree of hyperbole (H.O.D. at 15) and that District witnesses credibly testified that they did not receive notice of A.W.'s service agreement at PA Cyber and did not terminate Dr. Brent's recommended transition plan (id. at 12, 19).  Nevertheless, for the reasons identified *supra*, the court finds that the nontestimonial extrinsic evidence—including evaluation reports, service agreements, and IEPs—as well as the record in its entirety, justifies a conclusion that the District failed to evaluate A.W. within a reasonable time and denied him a FAPE.  The purported inconsistencies in A.W.'s mother's testimony that the District brings to the court's attention (see Doc. 20 at 18-20; Doc. 23 at 5-6) do not alter this conclusion.

each qualified handicapped person who is in the recipient's jurisdiction.").[28]

Section 504 also contains Child Find and evaluation requirements.  34 C.F.R.

§§ 104.32, 104.35.  Violations of the IDEA "almost always" constitute violations of

Section 504.  See Andrew M. v. Del. Cnty. Office of Mental Health & Mental

Retardation, 490 F.3d 337, 350 (3d Cir. 2007).  Nevertheless, a violation of the IDEA

is not a *per se* violation of Section 504; a plaintiff must still prove the elements of a

Section 504 claim.  Id. at 349.

To prevail on their Section 504 claim, plaintiffs must demonstrate that (1)

A.W. was "disabled" under the Rehabilitation Act; (2) he was "otherwise qualified"

to participate in school activities; (3) the District receives federal financial

assistance; and (4) he was excluded from participation in, denied the benefits of, or

subject to discrimination at, the school.  Centennial Sch. Dist. v. Phil L. *ex rel.*

Matthew L., 799 F. Supp. 2d 473, 481 (E.D. Pa. 2011) (quoting Ridgewood Bd. of

Educ. v. N.E. *ex rel.* M.E., 172 F.3d 238, 253 (3d Cir. 1999)).[29]  Plaintiffs need not

show that the District intended to discriminate against A.W. to obtain relief.  See id.

Chapter 15 of the Pennsylvania Code implements the statutory and

regulatory requirements of Section 504.  22 PA. CODE § 15.1(a).  Because Chapter 15

---

[28] The District argues that Section 504 does not create an entitlement to a FAPE.  (Doc. 20 at 14 n.8).  The court rejects this contention in light of controlling Third Circuit authority to the contrary.  See, e.g., D.K., 696 F.3d at 253 n.8 ("As under the IDEA, providing a FAPE in accordance with § 504 requires a school district to 'reasonably accommodate the needs of the handicapped child so as to ensure meaningful participation in educational activities and meaningful access to educational benefits.'" (quoting Ridley, 680 F.3d at 280)).

[29] There is no dispute that the District receives federal assistance.  (Doc. 7 ¶ 52).

does not preempt or expand the rights and liabilities under Section 504, the court

will treat Chapter 15 as coextensive with Section 504.  See K.K. *ex rel.* L.K. v.

Pittsburgh Pub. Sch., No. 13-4450, __ F. App'x __, 2014 WL 4670038, at *4 n.3 (3d Cir.

Sept. 22, 2014) (quoting 22 PA. CODE § 15.11).[30]

Given that plaintiffs' Section 504 claim is derivative of their IDEA claim, the

Hearing Officer largely considered both claims under the framework of the IDEA.

(See H.O.D. at 8 n.4).  The Hearing Officer did not, for example, conduct a separate

analysis of A.W.'s eligibility for services under Section 504.  Nor do the parties

contest whether A.W. was eligible for Section 504 accommodations.[31]  Despite a

"substantial overlap" between the criteria for eligibility, a qualifying disability

under the IDEA does not necessarily imply a qualifying disability under Section

504.  D.E. v. Cent. Dauphin Sch. Dist., No. 06-2423, 2013 WL 7752393, at *5 n.19

(M.D. Pa. Jan. 3, 2013), aff'd in part and rev'd in part on other grounds, 765 F.3d 260

(3d Cir. 2014).  Section 504 defines a "handicapped person" as a person who "(i) has

a physical or mental impairment which substantially limits one or more major life

activities, (ii) has a record of such an impairment, or (iii) is regarded as having such

an impairment."  34 C.F.R. § 104.3(j)(1).[32]  Eligibility under the IDEA does not

---

[30] The court acknowledges that K.K. is a nonprecedential opinion but nevertheless finds persuasive the court's analysis of Chapter 15.

[31] For the purposes of its motion, the District assumes satisfaction of the first three elements of plaintiffs' Section 504 claim.  (Doc. 20 at 13-14).

[32] "Major life activities" include "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."  34 C.F.R. § 104.3(j)(2)(ii).

necessitate an impairment that substantially limits a major life activity.  D.E., 2013 WL 7752393, at *5 n.19.

The court finds by a preponderance of the evidence that A.W. had a qualifying disability during the relevant time period.  Importantly, the District in fact implemented Section 504 service agreements for A.W. in November 2011. These agreements, which both District personnel and A.W.'s mother signed, identified A.W.'s disabilities as social phobia and generalized anxiety disorder and noted that, due to these disabilities, "[A.W.] has difficulty coming to school and remaining in the classroom setting."  (S-5 at 1; S-6 at 1).  Dr. Brent's and Dr. Grisolano's evaluations confirmed that A.W. suffered from anxiety disorders and concluded that these disorders frustrated A.W.'s ability to attend school.  (S-13 at 5; S-20 at 10, 13).  A.W.'s anxiety therefore substantially limited his ability to learn in the physical school environment.

Having found a denial of a FAPE under the IDEA, the court need not separately consider whether the District failed to provide a FAPE under Section 504.  Andrew M., 490 F.3d at 350 ("[W]hen a state fails to provide a disabled child with a [FAPE], it violates the IDEA.  However, it also violates [Section 504] because it is denying a disabled child a guaranteed education merely because of the child's disability.").  Hence, the court concludes that the District violated Section 504 by failing to evaluate A.W. within a reasonable time after suspecting a disability under

Section 504 and by failing to offer appropriate accommodations until December 2012.[33]

C.    ADA

Plaintiffs also advance a derivative claim under the ADA.  (Doc. 1 ¶ 53).  The IDEA permits a party to bring related claims under Section 504 and the ADA but requires that the party exhaust those claims in state administrative proceedings before commencing a federal action seeking relief available under the IDEA.  20 U.S.C. § 1415(*l*).  The IDEA's exhaustion requirement is jurisdictional.  James S. *ex rel.* Thelma S. v. Sch. Dist. of Phila., 559 F. Supp. 2d 600, 616 (E.D. Pa. 2008); see also R.T. v. Se. York Cnty. Sch. Dist., No. 1:07-CV-0232, 2007 WL 587221, at *2 (M.D. Pa. Feb. 20, 2007) ("In the Third Circuit, the exhaustion requirement is a prerequisite for a District Court to have subject matter jurisdiction over a claim under the IDEA, or any claim that seeks relief similar to that available under the IDEA.").  Exhaustion may be excused when a plaintiff seeks compensatory damages

---

[33] Plaintiffs argue that the District procedurally violated Section 504 by failing to conduct an evaluation, as contemplated by 34 C.F.R. § 104.35, before implementing service agreements in November 2011.  (Doc. 22 at 9-10; Doc. 24 at 7-8).  The District disputes that any procedural violation is actionable, avers that it evaluated A.W. by discussing his academic performance and reviewing his academic records, and questions the wisdom of an interpretation of Section 504 that would prevent interim interventions pending a full evaluation.  (Doc. 23 at 1-4).  The court agrees with the Hearing Officer that any failure to evaluate A.W. before offering interim interventions in the form of service agreements did not itself result in a denial of a FAPE.  (See H.O.D. at 17).  As set forth in this memorandum, the court finds a denial of a FAPE by virtue of the District's subsequent and substantive failure to offer A.W. necessary disability-related accommodations, and, therefore, need not further address the parties' interpretations of Section 504's "preplacement" evaluation requirement.

or other forms relief that are not available under the IDEA.  James S., 559 F. Supp. 2d at 618; Colon, 443 F. Supp. 2d at 668.

In the case *sub judice*, plaintiffs did not raise an ADA claim at the due process hearing.  (See N.T. 30:3-31:24).  Nor do they now seek compensatory damages or other forms of relief not available under the IDEA.  (See Doc. 1).  Accordingly, the court must dismiss *sua sponte* plaintiffs' ADA claim for lack of subject matter jurisdiction.  See I.H. *ex rel.* D.S. v. Cumberland Valley Sch. Dist., 842 F. Supp. 2d 762, 776 (M.D. Pa. 2012) (dismissing student's ADA claim, which was based on the same set of facts and sought the same relief as his IDEA claim, for failure to exhaust administrative remedies).

### D.    Compensatory Education

A student is entitled to compensatory education when he has been denied a FAPE.  P.P., 585 F.3d at 739.  Compensatory education is an equitable remedy that seeks to provide the educational services to which a student was entitled.  Jana K., 2014 WL 4092389, at *17 (citing Lester H. v. Gilhool, 916 F.2d 865, 872 (3d Cir. 1990)). A compensatory education award "should aim to place disabled children in the same position they would have occupied but for the school district's violations of IDEA."  See Ferren C. v. Sch. Dist. of Phila., 612 F.3d 712, 717 (3d Cir. 2010) (quoting Reid v. District of Columbia, 401 F.3d 516, 518 (D.C. Cir. 2005)).

The Hearing Officer declined to award compensatory education.  He reasoned that A.W.'s mother changed her son's placement to Raider Academy when the District would have reasonably implemented an IEP; consequently, A.W.'s mother thwarted the benefits of the District's services.  (H.O.D. at 16).  The court

has already held that A.W.'s enrollment in Raider Academy did not release the District from its obligation to provide A.W. a FAPE. Because the District deprived A.W. of meaningful educational benefits during much of his tenure at Raider Academy, A.W. is entitled to compensatory education during the period of deprivation.

The Hearing Officer also concluded that it would be inequitable to award compensatory education on the grounds that Parents delayed the psychiatric evaluation and apparently contributed to the volitional nature of A.W.'s absenteeism. (Id. at 17). As the court explained *supra*, A.W.'s mother's initial rejection of the proposed psychiatric evaluation did not excuse the District's Child Find and FAPE violations. Moreover, Dr. Brent's and Dr. Grisolano's evaluation reports concluded that A.W. developed avoidance behaviors over time but did not solely attribute this development to Parents. (See S-13 at 4-5; S-20 at 15 ("[A.W.'s] parents and educators need to ensure that they do not inadvertently reinforce his escape behavior . . . .")). To the extent that Parents contributed to volitional absences during the relevant time period, it was erroneous to deny compensatory education in its entirety on that basis.[34]

The District argues that compensatory education is unjustified because Dr. Grisolano concluded that A.W. did not require replacement instruction. (Doc. 20 at 17). The court disagrees. Academic advancement is "an important factor in

_____

[34] The court observes that while A.W.'s earlier attendance records contain certain notations regarding recreational activities (see S-1 at 2-3), corresponding attendance information for the relevant time period is not part of the record.

determining educational benefit" but is not dispositive of the FAPE inquiry.  <u>D.S.</u>,
602 F.3d at 565 (quoting <u>Rowley</u>, 458 U.S. at 203); <u>see</u> <u>also</u> 34 C.F.R. § 300.101 ("Each
State must ensure that FAPE is available to any individual child with a disability
who needs special education and related services, even though the child . . . is
advancing from grade to grade.").  Notwithstanding A.W.'s strong academic
performance at Raider Academy, the District's failure to provide A.W. with
appropriate emotional support services denied him a FAPE and impeded his
overall educational progress.  <u>See</u> <u>Breanne C.</u>, 732 F. Supp. 2d at 483.  Some degree
of relief is warranted.[35]

A right to compensatory education accrues when the school district knows or
should have known that a disabled student was not receiving a FAPE.  <u>Lauren W.</u>
<u>ex rel.</u> <u>Jean W. v. DeFlaminis</u>, 480 F.3d 259, 272 (3d Cir. 2007).  The student is
entitled to compensatory education "for a period equal to the period of deprivation,
excluding only the time reasonably required for the school district to rectify the
problem."  <u>D.K.</u>, 696 F.3d at 249 (quoting <u>M.C.</u>, 81 F.3d at 391-92).  In the instant
matter, the District was on notice of a likely disability by November 1, 2011 but
failed to implement appropriate educational services until December 14, 2012, the

---

[35] The court further rejects the District's contention that the amount of any
compensatory education should change as a function of A.W.'s actual placement
during the period of deprivation.  (Doc. 20 at 18).  The goal of compensatory
education is to put A.W. in the position that he would have been in absent the
District's denial of a FAPE.  <u>Ferren</u>, 612 F.3d at 717.  A.W. likely would not have
needed to attend Raider Academy had appropriate services been in place.  In any
event, the record does not support a finding that all emotional support services that
the District eventually offered were exclusive to the brick-and-mortar setting.  (S-21
at 26).

projected start date of those services.  (See S-21).  Accordingly, A.W. is entitled to compensatory education for the period of deprivation between November 1, 2011 and December 14, 2012, excluding the amount of time after November 1, 2011 that the District reasonably required to evaluate A.W. and develop an appropriate IEP.[36]

Determining the amount of a compensatory education award requires a fact-specific inquiry.  The award should "match the quantity of services improperly withheld throughout that time period, unless the evidence shows that the child requires more or less education to be placed in the position he or she would have occupied absent the school district's deficiencies." Jana K., 2014 WL 4092389, at *17 (reasoning that this approach comports with Third Circuit precedent).  On the existing record, the court is unable to ascertain the appropriate amount of compensatory education.  A.W.'s eventual IEPs offered certain emotional support services and speech and language therapy, but the court cannot extrapolate from these IEPs the amount of additional services, if any, that are needed to cure the District's protracted deprivation of benefits.  Indeed, the period of deprivation may have had an adverse compounding effect on A.W.'s educational progress.  Because the Hearing Officer concluded that relief was unwarranted, he did not make any factual findings concerning the appropriate amount of compensatory education.

Given the Hearing Officer's expertise in this subject, the court concludes that the Hearing Officer should address the issue of compensatory education in the first instance.  The court will thus remand this matter to the Hearing Officer to

---

[36] A.W.'s December 2012 IEPs indicated that he was not eligible for Extended School Year services.  (S-21 at 24; P-22 at 29).

determine, consistent with this memorandum, the amount of compensatory education to which A.W. is entitled between November 1, 2011 and December 14, 2012.  See, e.g., Reid, 401 F.3d at 526 (noting that a district court may remand to the hearing officer "in light of the absence of pertinent findings in the administrative record"); Amanda A. v. Coatesville Area Sch. Dist., No. 04-4184, 2005 WL 426090, at *7 (E.D. Pa. Feb. 23, 2005) (remanding to state administrative process to determine compensatory education award).  On remand, the Hearing Officer should also determine what form the compensatory education should take.

## IV.    **Conclusion**

For all of the foregoing reasons, the court will deny the District's motion for judgment on the supplemented administrative record, grant in part and deny in part plaintiffs' motion for judgment on the supplemented administrative record, reverse in part the Hearing Officer's decision, and remand this matter to the Hearing Officer for further proceedings to determine the appropriate compensatory education award.  An appropriate order will issue.


　　　　　　　　　　　　　　　 /S/ CHRISTOPHER C. CONNER
　　　　　　　　　　　　　　　Christopher C. Conner, Chief Judge
　　　　　　　　　　　　　　　United States District Judge
　　　　　　　　　　　　　　　Middle District of Pennsylvania


Dated:     January 28, 2015