## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| A.W., by and through his parents, H.W. and A.W., | : | CIVIL ACTION NO. 1:13-CV-2379 |
| | : | |
| | : | (Chief Judge Conner) |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| MIDDLETOWN AREA SCHOOL DISTRICT, | : | |
| | : | |
| Defendant | : | |

## MEMORANDUM

This action recrudesces on appeal from Pennsylvania Special Education
Hearing Officer William F. Culleton, Jr., Esq. ("Hearing Officer"), for the purpose of
determining an appropriate compensatory education award.   Minor plaintiff A.W.,
by and through his parents H.W. and A.W. ("Parents"), filed the above-captioned
action against defendant Middletown Area School District ("District").   In its first
opinion, the court concluded that the District violated the Individuals with
Disabilities Education Act ("IDEA"), as amended, 20 U.S.C. § 1400 *et seq.*; Section
504 of the Rehabilitation Act of 1973 ("Section 504"), as amended, 29 U.S.C. § 794;
and Chapters 14 and 15 of the Pennsylvania Code, which respectively codify the
IDEA and Section 504 as well as their accompanying administrative regulations.
See 22 PA. CODE § 14.102(a)(1); 22 PA. CODE § 15.1(a).   The court concluded that the
District violated the IDEA's Child Find requirements with respect to A.W.'s
disabilities and that it failed to provide A.W. with a free appropriate public
education ("FAPE") between November 1, 2011 and December 14, 2012.

On remand, the Hearing Officer awarded A.W. several forms of compensatory education, described *infra*.  Both parties have moved for judgment on the administrative record.  The District seeks, *inter alia*, a reduction in the Hearing Officer's compensatory education award.  Parents seek an adjustment to the award based on an alleged mathematical miscalculation.  After thoroughly reviewing the record, the court will deny the parties' motions.

## I.  <u>Background</u>[1]

This case appears before the court on appeal from the Hearing Officer's findings and decision.[2]  In the first proceeding, A.W. presented several claims relating to his social and psychological disabilities.  Some explication on the issues in the prior appeal is useful for providing the context necessary to understand the legal and factual foundations of this case.

### A.     The Previous Appeal

A.W. was a student at the District for most of his schooling career.  (N.T. 659:21-22).  Throughout his schooling, A.W. suffered from generalized anxiety disorder, separation anxiety disorder, social phobia, depressive disorder, and oppositional defiant disorder.  (H.O.D. at 2 ¶¶ 1-2).  A.W.'s emotional needs

---

[1] Citations to the record include the Hearing Officer's January 11, 2016 decision (Doc. 70-2 ("H.O.D.")); the notes of testimony from November 19, 2015 (Doc. 70-5 ("N.T. __")); joint exhibits (Docs. 70-6, 70-7 ("J-")); Parents' exhibits (Docs. 70-8, 70-9 ("P-")); and the District's exhibits (Docs. 70-10, 72-2 ("S-")).

[2] This proceeding primarily concerns the compensatory education remedy that the Hearing Officer awarded to A.W. on remand.  To the extent that the facts essential to the previous appeal remain salient, they will be restated herein.  A full recitation of the facts is available in the court's prior opinion in this case.  See <u>A.W. ex rel. H.W. v. Middletown Area Sch. Dist.</u>, No. 1:13-CV-2379, 2015 WL 390864 (M.D. Pa. Jan. 28, 2015).

manifested in myriad avoidance behaviors at school beginning in the 2011-2012 school year, when A.W. was approximately 13 years old.  (<u>Id.</u> at 3 ¶¶ 10-11).  The primary concern during A.W.'s attendance at brick and mortar schools was his absenteeism.  During the 2011-2012 school year, A.W. was absent for 71 school days.  (<u>Id.</u>)  A.W.'s absenteeism became so problematic that his parents were cited for violating truancy laws.  (<u>Id.</u> at 4 ¶ 15).  Most of these absences were attributable to A.W.'s anxiety disorders.  (<u>Id.</u>)  Moreover, A.W.'s grades suffered tremendously during this year, and he began exhibiting disruptive behaviors during class.  (<u>Id.</u> at 3-4 ¶¶ 13-15).  A.W.'s mother called the District on November 1, 2011 to voice her frustration with the District's failure to offer sufficient support services to her son.  <u>A.W.</u>, 2015 WL 390864, at *3.

The District provided limited support mechanisms for A.W. beginning in February 2012 pursuant to a Section 504 service agreement.  (H.O.D. at 4 ¶¶ 17-18).  These supports proved unsuccessful.  (<u>Id.</u>)  Parents removed A.W. from his brick and mortar school on March 29, 2012 and enrolled him in the District's cyber school.  (<u>Id.</u> at ¶¶ 20-21).  A.W. attended cyber school through the second quarter of the 2012-2013 school year.  (<u>Id.</u>)  The District did not continue the Section 504 agreement or any other special education supports while A.W. was enrolled in cyber school.  (<u>Id.</u> at ¶ 23).

The District and Parents produced an Individualized Education Plan ("IEP") during December 2012, with the goal of implementing it on December 14, 2012.  (<u>Id.</u> at 5 ¶ 27).  The IEP provided A.W. up to 60 minutes of in-school emotional support every six days.  (<u>Id.</u>)  The school also offered A.W. instruction on coping and self-

regulation skills, communication, and school participation. (Id.) The IEP provided
A.W. a support plan, processing time, preferential seating in class, breaks from
class, and study hall time. (Id.) The IEP team, which included Parents, later
revised the plan to include speech and language support and to reflect A.W.'s
enrollment in Dauphin County Technical School ("DCTS"). (Id. at 5 ¶¶ 28-29).
Fewer than two months later, A.W. and Parents moved out of the District, but A.W.
maintained enrollment at DCTS until tenth grade. (Id. at 5 ¶¶ 31-33).

Parents filed a due process complaint against the District on February 20,
2013. (Doc. 1 ¶ 3). In their complaint, Parents averred that the District denied A.W.
a FAPE and contravened its Child Find requirements under the IDEA. (Doc. 71-3
at 8-11). The Hearing Officer concluded that the District did not abdicate its
responsibilities under the IDEA and accordingly denied Parents' claims in his
initial order on June 15, 2013. (Id. at 20). Parents subsequently appealed the
Hearing Officer's decision to this court. (Doc. 1 at 24). Parents requested that the
court reverse the Hearing Officer's decision and conclude that the District did not
provide A.W. with a FAPE during the 2011-2012 and 2012-2013 school years through
January 28, 2013. (Id. at 24). Parents also sought a compensatory education
remedy. (Id.)

The court issued its initial memorandum (Doc. 26) and accompanying order
(Doc. 27) on January 28, 2015. The court found that the District breached its Child
Find duties under the IDEA. A.W., 2015 WL 390864 at *13. The court further
concluded that the District failed to provide A.W. with a FAPE beginning on
November 1, 2011 (when A.W.'s mother contacted the District) and ending on

4

December 14, 2012 (when the District ultimately enacted an IEP). Id. at *14.  With

respect to the appropriate remedy, the court concluded that the Hearing Officer

should have awarded A.W. compensatory education.  Id. at *18.

The court remanded the matter to the Hearing Officer to determine the

precise amount of compensatory education that A.W. was due.  Id.  The court

remanded the case because it was "unable to ascertain the appropriate amount of

compensatory education" on the existing record.  Id.  Although the District's

December 2012 IEP provided A.W. with, *inter alia*, emotional support services, the

court could not "extrapolate from these IEPs the amount of additional services, if

any, that are needed to cure the District's protracted deprivation of benefits."  Id.

Additional fact finding was warranted because "the period of deprivation may have

had an adverse compounding effect on A.W.'s educational progress."  Id.  The court

directed the Hearing Officer to determine the "reasonable level of reimbursement

[that] will match the quantity of services improperly withheld throughout that time

period, unless the evidence shows that the child requires more or less education to

be placed in the position he or she would have occupied absent the school's

deficiencies."  Id. (quoting Jana K. *ex rel.* Tim K. v. Annville-Cleona Sch. Dist., 39 F.

Supp. 3d 584, 608 (M.D. Pa. 2014)).

**B.    The Instant Appeal**

A.W. transferred from the Middletown Area School District to the Lower

Dauphin School District ("LDSD") in February 2012.  (N.T. 552:17-20).  A.W.

remained enrolled in DCTS after Parents filed their due process complaint against

the District.  (Id. at 552:21-24).  After approximately a year, however, A.W.'s

anxieties heightened, resulting in a resurgence of absences. (Id. at 555:19-12). A.W.

reenrolled in the District's cyber school. (Id.) Despite A.W.'s attempts at engaging

with brick and mortar schooling, his anxieties and phobias quelled his ability to

maintain an active social life. (Id.) Parents testified that A.W. made only one friend

during his time in school and that he rarely interacts with non-family members.

(Id.) A.W.'s phobias have also failed to improve since December 2012. A.W. still

maintains an extreme fear of germs and sickness. (Id. at 564:18-566:6). He also

avoids locations with large numbers of people. (Id. at 568:11-23). These phobias

and anxieties have prevented A.W. from working. After accepting a job offer, for

example, A.W. failed to attend a mandatory orientation because of his anxiety with

respect to the large number of other new employees that would attend. (Id.)

A.W. sought an Independent Educational Evaluation ("IEE") from Dr. Tracy

Swanson ("Swanson") in November 2015. (J-2 at 1). Swanson administered a

battery of psychological, language, and mathematics examinations to A.W. (Id. at 5-

6). Swanson concluded that A.W. does not suffer from a specific learning disability.

(N.T. 615:20-25). She also concluded that A.W. is "significantly anxious" and

exhibits mild depressive symptoms. (Id. at 616:3-6). With regard to A.W.'s social

skills, Swanson testified that he "has a lack of ability to develop sincere

relationships, meaningful relationships with others outside of his family." (Id. at

650:15-22). A.W.'s social skills are markedly impaired in the school setting, where

he is unable to raise his hand or develop relationships with his peers. (Id. at 653:24-

654:13).

Swanson accordingly concluded that an IEP was appropriate for A.W., but found that the District's December 2012 IEP inadequately supported A.W.'s needs. (Id. at 631:5-17).  She adduced that the IEP failed to specify curative measures for anxiety-induced absences, and that it did not provide counseling for A.W.  (Id.) Moreover, Swanson specified that the IEP should have provided more intensive services because A.W. never received early psychological intervention.  (Id. at 633:8-22).  Swanson noted that delays in psychological intervention cause therapy to become less effective over time.  (Id. at 635:25-636:6).  In A.W.'s case, the residual and compounding effects of his anxious behaviors pervaded his entire school day. (Id. at 673:20-25).  Swanson testified that A.W. has nevertheless achieved some success over the past several years despite the dearth of counseling support.  (Id. at 658:12-659:1).  Swanson identified A.W.'s increasing coping skills, his ability to venture into an environment by himself in limited circumstances, and his slightly reduced germ phobia as examples of those achievements.  (Id.)  A.W.'s interpersonal social skills have not improved.  (Id.)

Pertinently, Swanson noted that A.W.'s anxiety inarguably prevented him from reaping the full benefits of a brick and mortar school setting.  (Id. at 720:5-9). Swanson opined that the District should have provided emotional and academic supports well before 2010, when A.W.'s emotional disturbances were becoming apparent to the District's employees.  (Id.)  Swanson concluded that A.W.'s current disturbances became manifold through his early education years.  (Id. at 722:4-11). She submitted that a lack of early intervention substantially contributed to A.W.'s disturbances because his anxieties and phobias became entrenched over time.  (Id.

at 730:4-7).  A.W. would thus require more services to enable him to challenge his anxieties and phobias than a younger student would.  (Id. at 732:14-19).  Parents conceded that A.W. has no particular interest in returning to school and wants to start a career in construction.  (Id. at 575:6-14).  He does, however, want to utilize his compensatory education award to continue learning.  (Id. at 583:8-16).

Swanson also testified as to the appropriate amount and type of compensatory education that the District should provide to A.W.  She explained that, because A.W. is finishing school, there is little time "to help him develop the skills that he needs to function normally in the community and to have a career." (Id. at 659:21-24).  Swanson specifically recommended career remediation services as the means for A.W. to attain the needed skills to seek and retain employment. (Id.)  She also recommended that A.W. undergo cognitive behavioral therapy ("CBT").  (Id. at 661:21-662:2).

Swanson provided that A.W. would likely require ongoing services for six months to one year, or more.  (Id. at 662:6-9).  She recommended formal CBT sessions for one to two hours per week, and small group sessions once per week to once per month.  (Id. at 662:22-664:21).  Swanson was unable to precisely establish the number of days that A.W. was absent as a result of his disability because of the length of time that he exhibited anxious behaviors.  (Id. at 674:15-25).  Irrespective of the number of days that A.W. missed school because of his disability, Swanson testified that A.W. would likely require more than one hour of compensatory education services for each hour of school missed to compensate for A.W.'s loss of educational benefit.  (Id. at 680:17-681:8).  Swanson explained that, although A.W. is

on track to graduate from high school, the compensatory education would compensate for "what he could have done if he hadn't had that anxiety." (Id. at 687:5-6).

Swanson's IEE supplies further compensatory education recommendations for A.W. Therein, she notes that A.W. requires additional physical education requirements for graduation and concludes that the District should pay for a gym membership to allow A.W. to obtain those credits without entering a brick and mortar school. (J-2 at 16). She also suggests that the District pay for a trade school or, if A.W. cannot attend such a school, an online trade program. (Id.) She further recommends that the District pay for on-the-job training and additional courses in cyber school to compensate for A.W.'s lost schooling time. (Id.) Swanson finally proposes that the school pay for CBT to help A.W. control his anxiety. (Id.)

The Hearing Officer filed his decision in the instant matter on January 11, 2016. (Doc. 70-2). The Hearing Officer's decision concluded that, based on the testimony at the two hearings in this case, A.W.'s "constellation of emotional needs has led repeatedly to school-avoidance behaviors that were reinforced and compounded whenever [A.W.] was successful in avoiding school-related situations and demands, whether by refusing to attend brick-and-mortar schools or by refusing to participate in school activities while in brick-and-mortar school buildings." (H.O.D. at 2 ¶ 2). These behaviors, according to the Hearing Officer, are now "less amenable to intervention" than during A.W.'s eighth and ninth grade years. (Id. at 6 ¶ 39). The Hearing Officer concluded that the District's failure to timely intervene produced a compounding effect that inured A.W. to his avoidance

behaviors. (Id.) Apropos to this appeal, the Hearing Officer found that "[t]he period from November 1, 2011 to December 14, 2012 was a substantial cause of [A.W.'s] present educational deficits, but periods of time both before and after that period also substantially contributed." (Id. at 6 ¶ 41).

The Hearing Officer found that A.W. was absent for a majority of school days between November 1, 2011 and March 29, 2012, the date that A.W. started cyber school. (Id. at 13). These absences, together with A.W.'s inability to benefit from the District's brick and mortar setting and extracurricular offerings, led the Hearing Officer to conclude that A.W. received no educational benefit between November 1, 2011 and March 29, 2012. (Id. at 14). The Hearing Officer also analyzed the period during which A.W. was enrolled in cyber school, concluding that A.W. reaped substantial academic benefit because of his near-perfect attendance record and educational assessments. (Id. at 15-16). Notwithstanding the academic benefits, the Hearing Officer concluded that the District failed to provide other educational benefits to A.W. while he was enrolled in cyber school. (Id.) The District notably withheld social, emotional, and behavioral counseling opportunities. (Id.)

The Hearing Officer substantially agreed with Swanson's recommendations, and noted that A.W. is in need of post-secondary transition services, vocational training, therapeutic career services "to assist [A.W.] in overcoming fears through gradual transition to any physical location required for training," a psychological therapy program in both individual and group settings, and a plan to ensure that A.W. attains necessary physical education credits. (Id. at 6-7 ¶¶ 43-47). The Hearing

10

Officer based his conclusions upon a favorable credibility finding with respect to Parents and Swanson.  (Id. at 9).

The Hearing Officer noted that the District was aware that A.W. needed an IEP by November 1, 2011.  (H.O.D. at 17-18).  The Hearing Officer reduced the compensation award by 60 days, which is the amount of time the IDEA provides for local education agencies ("LEAs") to establish and commence an IEP.  34 C.F.R. § 300.301(c)(1)(i); (H.O.D. at 17-18).  The Hearing Officer further reduced the award by another ten days to reflect the time the District needed to convene an IEP team meeting.  (Id.)  The compensatory education award thus reflects the education that A.W. should have received between January 11, 2012 and December 14, 2012.  (Id.)

The Hearing Officer ultimately awarded A.W. seven hours of compensatory academic education in the form of regular teacher services for each school day beginning on January 11, 2012, up to and including March 29, 2012 (the date A.W. transferred to cyber school); three hours and thirty minutes of compensatory psychological therapy per week for every full or partial week A.W.'s school was open between January 11, 2012 up to and including December 14, 2012 (the date the District enacted A.W.'s IEP); one hour of compensatory extracurricular education per week for every full or partial week A.W.'s school was open between January 11, 2012 up to and including December 14, 2012; and five hours of compensatory vocational education per week for every full or partial week A.W.'s school was open between the beginning of the 2012-2013 school year up to and including January 28, 2013.  (Id. at 21-22).

The Hearing Officer's award was also based upon a finding that the instant case required additional remedies "above and beyond an hour-for-hour award." (Id. at 18).  The Hearing Officer's analysis included mention of complications that arose after A.W. left the District, indicating that A.W.'s avoidance behaviors continued while he was enrolled at LDSD.  (Id. at 18-19).  The Hearing Officer's award of transition, job-training, and psychological services represented only a portion of the time that A.W. needs to be "made whole," commensurate with the time that A.W. was enrolled at the District.  (Id.)  This award included the psychological therapy described *supra*, "to be provided at a pace that [A.W.] can meaningfully tolerate."  (Id. at 20).

The District subsequently filed an amended answer with a supplemental counterclaim on March 9, 2016.  (Doc. 68).  In its amended answer, the District posits that the Hearing Officer should have entered a compensatory education award totaling either 66 or 78 hours.  (Id.)  Parents then filed a motion for judgment on the administrative record.  (Doc. 73).  In their motion, Parents aver that the Hearing Officer's compensatory education award was erroneously calculated and thus request 35 additional hours of compensatory education to correct the error. (Id.)  Parents later amended their request to change the date from which A.W.'s compensatory education award should be measured.  (Doc. 77 at 8 n.1).  They aver that the Hearing Officer should have counted days beginning on December 14, 2011, not January 11, 2012.  (Id.)  The District filed its own motion for judgment on the administrative record on April 22, 2016.  (Doc. 75).  The motions are fully briefed and ripe for disposition.

II.   **Legal Standard**

When reviewing state administrative decisions under the IDEA, a district court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C § 1415(i)(2)(C).  The Court of Appeals for the Third Circuit has described this standard as "modified *de novo*" review under which the district court must give "due weight" to the findings of the hearing officer.  P.P. *ex rel.* Michael P. v. W. Chester Area Sch. Dist., 585 F.3d 727, 734 (3d Cir. 2009).  Pursuant to this standard, the hearing officer's factual findings should be considered *prima facie* correct; if the district court does not accept those findings, it is obligated to explain why.  S.H. v. State-Operated Sch. Dist. of Newark, 336 F.3d 260, 270 (3d Cir. 2003); see also Carlisle Area Sch. v. Scott P., 62 F.3d 520, 527 (3d Cir. 1995).

A district court must also accept the hearing officer's credibility determinations "unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion or unless the record read in its entirety would compel a contrary conclusion."  S.H., 336 F.3d at 270 (quoting Carlisle, 62 F.3d at 529).  If the district court accepts additional evidence, it may "accept or reject the agency findings depending on whether those findings are supported by the new, expanded record and whether they are consistent with the requirements of the [IDEA]."  Id. (quoting Oberti v. Bd. of Educ., 995 F.2d 1204, 1220 (3d Cir. 1993)).

A district court's review of the hearing officer's application of legal standards and conclusions of law is plenary.  Jana K., 39 F. Supp. 3d at 594 (citing Warren G.

v. Cumberland Cty. Sch. Dist., 190 F.3d 80, 83 (3d Cir. 1999)).  The Hearing Officer's conclusions regarding compensatory education are accordingly subject to plenary review.  G.L. v. Ligonier Valley Sch. Dist. Auth., 802 F.3d 601, 608 (3d Cir. 2015) (citing P.P., 585 F.3d at 735).  The reviewing court should not, however, "substitute its own notions of sound educational policy for those of local school authorities." S.H., 336 F.3d at 270 (citation omitted).  Subject to the foregoing standards, the district court may make findings by a preponderance of the evidence and grant appropriate relief, including attorneys' fees and compensatory education.  D.S. v. Bayonne Bd. of Educ., 602 F.3d 553, 564 (3d Cir. 2010).

## III.  Discussion

On appeal, the District asserts that the Hearing Officer's compensatory education remedies are unsupported by the record.  (Doc. 76 at 1).  The District also avers that the Hearing Officer's award of transition services should be provided by LDSD.  (Doc. 78 at 5).  Parents argue that the Hearing Officer's award should be largely affirmed, except that additional days of compensatory education should be added to the award to correct the Hearing Officer's miscalculation.  (Doc. 73).  The court will address the relevant issues *seriatim*.

### A.   The District's Objections to the Hearing Officer's Compensatory Education Award

The IDEA provides that, when a school district has abdicated its obligation to provide a FAPE to an eligible child, district courts are empowered to provide relief, including compensatory education.  G.L., 802 F.3d at 608 (citing A.W. v. Jersey City Pub. Sch., 486 F.3d 791, 802 (3d Cir. 2007)).  District courts craft compensatory

education remedies that station disabled children "in the same position they would have occupied but for the school district's violations of the IDEA." Id. (quoting Reid v. District of Columbia, 401 F.3d 516, 518 (D.C. Cir. 2005)).  The application of compensatory education remedies reflects Congress's desire to confer "broad discretion" upon district courts to fashion relief for children deprived of their right to a FAPE. Bucks Cty.Dep't of Mental Health/Mental Retardation v. Pennsylvania, 379 F.3d 61, 67 (3d Cir. 2004) (citing Sch. Comm. v. Dep't of Educ. of Mass., 471 U.S. 359, 370 (1985)).

### 1.   *Compensatory Academic Education*

The court's prior opinion expressly held that "A.W. is entitled to compensatory education during the period of deprivation between November 1, 2011 and December 14, 2012, excluding the amount of time after November 1, 2011 that the District reasonably required to evaluate A.W. and develop an appropriate IEP." A.W., 2015 WL 390864, at *18.  In this case, the District specifically appeals the Hearing Officer's award of compensatory academic education, transition services, and vocational services.  The District further asserts that those awards are either unsupported by the record evidence or were the responsibility of LDSD. (Doc. 76 at 11-12).  With respect to the compensatory academic education award totaling 663.5 hours, the District fervently asseverates that A.W. is on track to graduate, has met all of the District's educational standards for graduation, and neither requires nor desires compensatory academic education.  (Id.)

The District's arguments are without merit.  The Hearing Officer credited the testimony of the witnesses that A.W. presented at the hearing when crafting his

compensatory education remedy.  The court is bound to accept those credibility findings, "unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion or unless the record read in its entirety would compel a contrary conclusion." S.H., 336 F.3d at 270 (quoting Carlisle, 62 F.3d at 529).  In this case, the evidence clearly supports the Hearing Officer's award.  Swanson's IEE and testimony establish the need for a compensatory education remedy for academic time between November 1, 2011 and December 14, 2012 because of A.W.'s inordinate number of absences.  (J-2 at 15).  Swanson's IEE indicates that these absences were the direct result of A.W.'s ingrained avoidance behaviors and phobias.  (Id. at 7).  A.W.'s conduct at school exemplifies the pertinacity of his anxiety disorder.  This conduct is clearly the result of the District's failure to develop a plan to help A.W. cope with the crippling externalities of his compounding symptoms.

The District indicates that A.W.'s academic progress dramatically improved after leaving the District's brick and mortar school setting, with particularly marked progress respecting his grades and attendance records.  (Doc. 76 at 8).  The District thus avers that A.W. is no longer in need of compensatory academic education.  (Id.) Moreover, the District asserts that A.W. did not suffer any academic deficit while he attended school in a brick and mortar setting because he was successfully able to advance from class year to class year.  (Id.)  The District submits that a student's ability to graduate from one class year to the next should be the overriding concern in determining what form compensatory education remedies should take.  (Id.)  The District accordingly urges the court to find that A.W.'s progress over the course of

the entire school year should outweigh A.W.'s near-failure while in the District's brick and mortar setting.  (Id.)

The District's arguments are inapposite to the IDEA's mandate.  The purpose of compensatory education is not merely to provide a student with a "standards based diploma," as the District submits.  The purpose of the compensatory education remedy is to compensate a disabled child with education that an LEA improperly withheld under the IDEA.  "Thus, the appropriate and reasonable level of reimbursement will match the quantity of services improperly withheld through that time period, unless the evidence shows that the child requires more or less education to be placed in the position he or she would have occupied absent the school district's deficiencies."  Jana K., 39 F. Supp. 3d at 608.  Courts award compensatory education remedies to the extent necessary to ensure that the disabled child is in the same place as they would have occupied but for an LEA's IDEA violation.  G.L., 802 F.3d at 626.

The record indisputably establishes that A.W.'s academic performance suffered between November 1, 2011 and December 14, 2012.  From November 1, 2011 to March 29, 2012, A.W. was absent for over 103 school days.  (P-23).  Swanson's IEE also indicates that the District's continued dereliction of its duties compounded the negative effects of A.W.'s anxiety disorders.  (J-15).  The District's continuing failure to provide an IEP for A.W. during his eighth and ninth grade years reinforced his avoidance behaviors, which manifest in A.W.'s attendance record.  (H.O.D. at 14).  Moreover, A.W. maintained failing or very poor grades while enrolled in the District's brick and mortar school during the 2011-2012 school year.

(Id. at 4 ¶ 19).  The Hearing Officer concluded, on the basis of Swanson's testimony, that the District's failure to provide an IEP directly contributed to A.W.'s inability to function in the brick and mortar setting.  The court accordingly concludes that the Hearing Officer's compensatory academic education award of full days of education is appropriate for the period of time between November 1, 2011 and March 29, 2012 because of the District's deprivation of educational benefits during this time period.

### 2.   *Other Forms of Compensatory Education*

The Hearing Officer awarded A.W. several forms of alternative compensatory education for both periods at issue in this appeal: the period of a total deprivation of educational benefit (November 1, 2011 until March 29, 2012) and the period of partial deprivation of educational benefit (March 30, 3012 until December 14, 2012). (Id. at 21-22).  With respect to the period of total deprivation, the Hearing Officer awarded A.W. 30 minutes of psychological therapy for each week of school between November 1, 2011 and March 29, 2012.  (Id. at 15).  The Hearing Officer awarded this therapy as a replacement for speech and language therapy because A.W.'s speech and language issues have been resolved since he left the District's brick and mortar school.  (Id.)  The Hearing Officer also awarded A.W. one hour of a regular education teacher's services for each week the District's school was open during that period.  (Id. at 16).  The Hearing Officer directed a teacher to provide A.W. with social and extracurricular services that the District should have provided while A.W. was in its brick and mortar school.  (Id. at 16).

The Hearing Officer also made specific findings with respect to the period of partial deprivation, which occurred while A.W. attended cyber school.  The Hearing

Officer observed, based on A.W.'s near-perfect attendance record and his grades, that A.W. received "substantial academic educational benefit" while enrolled in the District's cyber school. (Id. at 15-16). But the Hearing Officer also found that the District did not provide benefits with respect to A.W.'s emotional well-being, behavioral self-regulation, or social skills development while he was enrolled in cyber school. (Id. at 16). The Hearing Officer concluded, however, that because A.W. was no longer attending school in a brick and mortar setting, emotional support would be unhelpful to A.W. (Id. at 15-16). The Hearing Officer thus substituted one hour of psychological therapy per week in lieu of emotional support services. (Id.) The Hearing Officer also provided A.W. with an additional 30 minutes of psychological therapy per week instead of speech and language therapy services. (Id.)

Finally, the District challenges the Hearing Officer's "make whole" services award. The Hearing Officer explicitly noted that "the exercise of equity requires an order for additional services, above and beyond an hour-for-hour award." (Id. at 18). When calculating A.W.'s award, the Hearing Officer was cognizant that some of A.W.'s present problems may have formed because LDSD also failed to provide A.W. with a FAPE. (Id. at 18-19).

The Hearing Officer concluded that the District's protracted failure to provide A.W. with a FAPE compounded his behavioral issues and that additional services were required to make A.W. "whole." (Id. at 19-20). The Hearing Officer ordered the District to provide two additional hours of psychological therapy per week and five hours of vocational therapy per week, which may include job

coaching or services obtainable at a vocational school.  (Id. at 21).  *In toto*, the

Hearing Officer awarded A.W. 3.5 hours of psychological therapy services per week

(totaling 136.5 hours), 39 hours of extracurricular program services, and 110 hours

of vocational services.  (Id. at 21-22).  These services are meant to compensate A.W.

for the deprivation of a FAPE and to make A.W. whole as a result of the

compounding effects of the District's delay in providing that FAPE to A.W.  (Id.)

        The District avers that the Hearing Officer's award should be limited to 66

hours of psychological therapy services.  (Doc. 76 at 14-15).  Moreover, the District

submits that the Hearing Officer's awards of compensatory vocational training and

extracurricular services are inappropriate.  (Id. at 6, 11).  The court will consider the

District's objections to each form of alternative compensatory education *seriatim*.

### a.      Psychological Therapy Services

        The District first objects to the number of hours of psychological services that

the Hearing Officer awarded to A.W.  (Id.)  Importantly, the District concedes that

psychological therapy is an appropriate compensatory education remedy for A.W.

(Id. at 13).  The District nevertheless contends that the Hearing Officer improperly

awarded A.W. 3.5 hours of psychological therapy services per week and instead

should have awarded A.W. one hour of psychological therapy services per week.

(Id.)  The District's assertion is based on Swanson's recommendation that A.W.

attend counseling in one hour sessions once or twice per week if he attends school

outside a brick and mortar setting, in combination with group therapy.  (N.T.

662:22-663:6).  The District's calculation is premised on providing A.W. individual

therapy once per week for the number of weeks the District failed to provide him a

FAPE and accompanying group therapy once per month. (Doc. 76 at 13). The District submits that providing A.W. with more than one hour of counseling "might actually be counter-productive" and that the Hearing Officer's award "would be bad for [A.W.]" (Doc. 68 ¶¶ 108-09).

The court disagrees with the District's assessment of the Hearing Officer's award. When fashioning compensatory education remedies, a child is "entitled to be whole with nothing less than a 'complete' remedy." G.L., 802 F.3d at 625 (citing Forest Grove Sch. Dist. v. T.A., 557 U.S. 230, 244 (2009)). Courts may award compensatory education to the degree necessary "to make up for the child's lost progress and to restore the child to the educational path he or she would have traveled but for the deprivation." Id. (citing D.F. v. Collingswood Borough Bd. of Educ., 694 F.3d 488, 498 (3d Cir. 2012)). Courts should calculate the amount of compensatory education a child receives to ensure that the child receives the same educational benefit that the LEA should have provided. Jana K., 39 F. Supp. 3d at 608. The quantity of services that the LEA improperly withheld should match the compensatory education remedy, "unless the evidence shows that the child requires more or less education to be placed in the position he or she would have occupied absent the school district's deficiencies." Id.

In this instance, the evidence clearly demonstrates that A.W. requires compensatory education in the form of psychological therapy services to make up for lost progress. Swanson's testimony indicates that the District's failure produced a compounding effect that recalcitrated A.W.'s avoidance behaviors. (N.T. 635:11-24, 680:17-681:8). She further testified that A.W. will require more psychological

therapy to overcome his anxiety than would have been necessary if the District had satisfied its responsibilities under the IDEA. (Id. at 680:17-681:8). Swanson explained that A.W. may need years of therapy to attain the position he would have had the District not deprived A.W. of his FAPE. (Id. at 733:25-734:13). Moreover, the Hearing Officer stated that the services are to be provided appropriately depending on A.W.'s current needs. (H.O.D. at 22 ¶ 2). The award does not require A.W. to actually withstand 3.5 hours of psychological services per week. The award may be spread out such that A.W. obtains 134.5 hours of psychological services over the course of several years. Parents and students may schedule and use compensatory education remedies to the extent necessary to fulfill the student's educational needs. See, e.g., Keystone Cent. Sch. Dist. v. E.E. *ex rel* H.E., 438 F. Supp. 2d 519, 525-26 (M.D. Pa. 2006). Hearing Officers need not particularize every aspect of a compensatory education award. (Id.) The court thus concludes that the evidence supports the Hearing Officer's award of 134.5 hours of compensatory psychological therapy services.

### b.    Vocational Services

The District next asserts that the Hearing Officer's award of compensatory vocational services, totaling 110 hours, is inappropriate because those services should have been provided by LDSD. The District submits that because A.W. attended a vocational program through LDSD, and because A.W. has filed a due process complaint against LDSD for failing to provide A.W. with a FAPE, LDSD should be responsible for A.W.'s vocational training. (Doc. 78 at 6).

The court disagrees.  As a threshold matter, the Hearing Officer's compensatory education awards were explicitly tailored to remedy *the District's* failure to provide A.W. a FAPE.  Indeed, the Hearing Officer noted that "it is neither appropriate nor possible on this record to determine whether or not [the other] district's offer of FAPE was sufficient to address the compounding effects of [A.W.'s] withdrawal from the technical school setting."  (H.O.D. at 19).  The Hearing Officer accordingly did not award compensatory education for any perceived failure by LDSD.  The Hearing Officer instead awarded the "portion of the needed therapy and vocational services, commensurate with the amount of time during which [the District] can be charged with a remedial obligation."  (Id.)

The Hearing Officer also made specific findings with respect to why the District must provide A.W. with vocational services.  As noted in the court's prior opinion, A.W. first applied to DCTS in 2011 while enrolled in the District.  A.W., 2015 WL 390864, at *3 n.5.  The school denied him admission.  (Id.)  The Hearing Officer ascribed A.W.'s rejection to a recommendation which provided that A.W. "was uncooperative, defiant, unreliable, and frequently late."  (Id.)  Because those conditions were related to A.W.'s disability, the Hearing Officer determined that A.W.'s inability to receive vocational services was linked to his absenteeism and avoidance behaviors.  (H.O.D. at 21).  The Hearing Officer thus concluded that the District's failure to provide A.W. a FAPE cost him the chance to obtain vocational services.  (Id.)

These findings are supported by the record evidence.  Swanson's IEE provides that A.W. was denied several vocational education opportunities because

of his disability and that his symptoms specifically precluded him from job training opportunities while enrolled at the District. (J-2 at 14). The court accordingly affirms the Hearing Officer's award of compensatory vocational education.

### c.   Extracurricular Services

The District also contests the Hearing Officer's award of one regular education teacher's extracurricular program services for one hour per week, for a total of 39 hours. (Doc. 76 at 11). The District asserts that the Hearing Officer's award was not based on record evidence or the Hearing Officer's findings of fact. (Id.) The District's *probata* do not meet its *allegata*. The Hearing Officer specifically found that A.W.'s condition prevented him from accesing extracurricular activities. (H.O.D. at 3 ¶ 5 (citing S-20 at 13-15)). This finding is amply supported by the record which, as noted *supra*, is replete with examples of A.W.'s avoidance behaviors. The District further protests the award because there is no guidance as to what form this award should take. (Doc. 76 at 11). Again, the court concludes that this assertion is unfounded. See Keystone Cent. Sch. Dist., 438 F. Supp. 2d at 525-26. The court affirms the Hearing Officer's award of compensatory extracurricular education.

### B.   Parents' Objections to the Hearing Officer's Compensatory Education Award.

Parents request that the court substantially affirm the Hearing Officer's compensatory education award. (Doc. 77 at 8). Parents also submit, however, that the Hearing Officer's award should be enlarged. (Id. at 8 n.1). Specifically, Parents argue that the Hearing Officer improperly reduced A.W.'s compensatory education

award by 70 calendar days instead of 70 school days when determining the date on which the District should have provided A.W. with special education services. (Id.) Parents submit that the Hearing Officer intended to reduce the amount of compensatory education that A.W. received by the number of school days within the 70 day calendar period, not 70 total calendar days. (Id.) Accordingly, because there are 43 school days within the specified 70 day calendar period, Parents argue that the Hearing Officer should have granted compensatory education beginning 43 calendar days after November 1, 2011. (Id.) The date Parents identified is December 14, 2011. (Id.)

Parents' arguments overcomplicate the Hearing Officer's calculation. Parents' calculation adds only the total number of school days to the November 1, 2011 date to reach the allegedly correct date of December 14, 2011. Parents' date, however, does not account for weekends or holidays, and would add several weeks to A.W.'s compensatory education award. Further, the IDEA provides LEAs 60 days to form an IEP from the date on which the LEA should have known an IEP was necessary. 34 C.F.R. § 300.301(c)(1)(i). Parents' suggested date would not provide the District a sufficient reduction to account for that 60-day period. The court cannot accept, based on its interpretation of the Hearing Officer's decision, that this was the Hearing Officer's intent. The date originally set by the Hearing Officer—January 11, 2012—ensures that the compensatory education award provides for a 60-day opportunity to create an IEP, as well as the 10 days that the Hearing Officer found necessary for convening an IEP meeting. The court

accordingly denies Parents' motion to enlarge the Hearing Officer's compensatory education award.

IV.   **Conclusion**

For the foregoing reasons, the court will deny the District's motion for judgment on the administrative record, deny Parents' motion for judgment on the administrative record, and affirm the Hearing Officer's decision.  An appropriate order will issue.

                                        /S/ CHRISTOPHER C. CONNER
                                        Christopher C. Conner, Chief Judge
                                        United States District Court
                                        Middle District of Pennsylvania


Dated:     October 25, 2016